699 P.2d 376

A. D'Wayne FARR and Miriam J. Farr, husband and wife, Plaintiffs-Appellees, Cross Appellants,

v.

TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA, a California corporation, formerly Occidental Life Insurance Company of California, Defendant-Appellant, Cross Appellee.

A. D'Wayne FARR and Miriam J. Farr, husband and wife, Plaintiff-Appellants,

v.

GALBRAITH & GREEN, INC., an Arizona corporation, Defendant-Appellee.

Nos. 1 CA–CIV 6566, 1 CA–CIV 6586.

Court of Appeals of Arizona, Division 1, Department D.

Filed Dec. 28, 1984.

Reconsideration Denied March 8, 1985.

Review Denied May 7, 1985.

Patten, Montague & Arnett by Wayne C. Arnett, Tempe, for plaintiffs-appellants, plaintiffs-appellees, cross appellants.

Evans, Kitchel & Jenckes, P.C. by Amy R. Coy, Phoenix, for defendant-appellant, defendant-appellee, cross appellee.

## OPINION

KLEINSCHMIDT, Judge.

A. D'Wayne Farr and Miriam J. Farr sued Occidental Life Insurance Company (Occidental) and its claims administrator, Galbraith & Green, Inc., to recover for an alleged bad faith refusal to pay benefits concededly due under a group health insurance policy.

The jury found for the Farrs and awarded $13,117.20 compensatory damages against both defendants and $50,000 punitive damages against Occidental and $20,-000 punitive damages against Galbraith & Green. The trial court granted a judgment notwithstanding the verdict as to Galbraith & Green. The trial court denied the Farrs' request for attorneys' fees. Occidental appealed and the Farrs cross-appealed on the issue of attorneys' fees and appealed the order granting judgment notwithstanding the verdict as to Galbraith & Green.

The case arises out of the birth of the Farrs' sixth child and the company's refusal to pay benefits for complications of childbirth. The Farrs, who had been insured with Occidental for ten years, had never until this incident experienced trouble with the payment of claims, and they were generally satisfied with the company's performance. They made two or three claims per year during that period. The insurance policy in question provided a maximum benefit of $800 for pregnancy. Complications of pregnancy, as opposed to routine expenses of pregnancy which exceeded $800, were covered on the basis of a percentage formula.

During 1978, Mrs. Farr became pregnant and her expected date of delivery was April 22, 1979. In December, 1978, she experienced vaginal bleeding and about a month later she was placed on complete bed rest. The vaginal bleeding continued and on January 28, 1979, she was hospitalized with temperatures ranging from 101 degrees to 102 degrees. She received medication to counteract uterine contractions and two days after admission was discharged with instructions for complete bed rest.

On February 1, 1979, Mrs. Farr was rehospitalized and delivered a premature baby. Following delivery, Mrs. Farr developed chest pains and a high fever. Diagnostic tests were undertaken and Mrs. Farr's hospitalization was prolonged.

The claim filed by Mrs. Farr with Galbraith & Green contained bills submitted in January, 1979, for a procedure administered to determine fetal age. It also reflected that in October of 1978 Mrs. Farr had undergone amniocentesis, the insertion of a needle through the abdominal wall to determine the sex of the fetus and whether it has normal chromosomes. The doctor's bill for the delivery reflected that the baby was expected in late April, 1979, but was actually delivered on February 1, 1979. That bill showed that a culture sensitivity test had been conducted in December, 1978, and that Mrs. Farr had been hospitalized for "third trimester bleeding". The claim was signed by the Farrs' doctor and bore a code number which meant that it was for a routine delivery.

The insurer paid a total of $800 following receipt of the doctor's bill. In March, 1979, Galbraith & Green received a claim directly from the hospital in the amount of $2,848.45, which reflected a "diagnosis from records" of "chorioamniotis [inflamation of fetal membranes caused by bacterial infection], front breech, intrauterine gestation, premature, delivered; premature rupture of membranes." The bill was for a six-day hospitalization. The bill also reflected that extensive x-rays, lab work, and diagnostic procedures had been undertaken and that a variety of medications had been prescribed.

Galbraith & Green's claims processor, Rose Marie Robinson, testified that it was her employer's policy to look only to the doctor's diagnosis on the claim form to determine whether or not a claim was to be paid as a complication of pregnancy. Mrs. Robinson recognized that the course of Mrs. Farr's treatment was out of the ordinary in a number of respects for a normal pregnancy. At some point she asked her supervisor whether the case involved complications of pregnancy and was told that it did not.

In late March, 1979, Galbraith & Green informed the plaintiffs by letter that their claim would not be paid. In mid-April Galbraith & Green received a letter from Mrs. Farr, followed later by a new claim form from Mr. Farr in which he set forth some of the complications she had experienced. In response, Galbraith & Green wrote to Mr. Farr as follows:

Before we can consider your wife's claim we need a statement from her doctor stating the complications of pregnancy at the time of delivery. The information we based her claim on does not indicate a complication of pregnancy as defined in your contract.

When we receive more information from her doctor, we will review the claim again and send to Occidental for review.

The author of the letter, Mrs. Robinson, testified that she intended to convey to the Farrs that the Farrs were supposed to procure the information from the doctor and provide it to Galbraith & Green. Mr. Farr testified that he did not think that Mrs. Robinson was trying to trick him with the letter. The Farrs were confused as to who was to supply the additional information. In any event, neither the Farrs nor Galbraith & Green made an effort soon thereafter to obtain additional medical information from the doctor or the hospital and Galbraith & Green did not follow up with Mr. and Mrs. Farr to inquire as to whether the requested information would be forthcoming. Nor did the Farrs make further inquiry to determine whether Galbraith & Green had received the information. Not long after writing the letter, Mrs. Robinson was reassigned to other duties and had no further contact with the claims.

The Occidental Claims Manual provides for a system of follow-up letters to be sent every two weeks while the claim is awaiting additional information. If the information is not received after three requests, a close-out letter is to be sent to the insureds. This procedure was not followed in this case.

A few months after the delivery, Mrs. Farr underwent gynecological surgery. Occidental paid for this as well as for all of the newborn's expenses.

Shortly after receiving the letter in October, the Farrs brought an action alleging

that the company was dealing in bad faith and seeking compensatory and punitive damages against both Occidental and Galbraith & Green. After the action was filed, counsel for the defendants requested a medical report from Mrs. Farr's doctor. This was provided and it described the complications of pregnancy Mrs. Farr had undergone. After receiving this letter, Occidental offered to pay Mrs. Farr the full contract benefits, provided that she would dismiss her bad faith action. This was rejected and thereafter Occidental paid the benefits that were due anyway.

## SUFFICIENCY OF THE EVIDENCE TO SUBMIT THE CLAIM OF BAD FAITH TO THE JURY

The appellant's first argument is that Occidental's conduct did not amount to a breach of the duty of good faith and fair dealing. Relying on *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 866 (1981), Occidental argues that the tort of bad faith is an intentional one. The company says that the evidence here will not support a verdict that it acted intentionally and denied the claim without a basis for doing so. Occidental characterizes what occurred as a misunderstanding as to who was to provide further corroboration for the claim and that the plaintiffs' attorney withheld the doctor's statement from Occidental.

■ While the tort of bad faith is often referred to as an intentional one, the cause of action is established if the plaintiff demonstrates that the defendant had knowledge of or recklessly disregarded the lack of a reasonable basis for denying the claim. *See Noble v. National American Life Insurance Co.*, *supra*. The evidence, viewed in the light most favorable to the Farrs, supports the submission of the case to the jury on a theory of reckless disregard of the absence of a reasonable basis for denying the claim.

The appellant's argument that counsel for the Farrs created the bad faith claim by unreasonably refusing to provide them with the doctor's statement concerning the claim has been settled by the jury. It nonetheless deserves comment. To understand the argument, it is necessary to first understand the sequence of events. The birth for which the claim was made occurred in February of 1979, and the claim for $800 was paid on March 22, 1979. Shortly thereafter, the hospital billed Galbraith & Green directly and on April 11, 1979, Mrs. Farr wrote Galbraith & Green a letter explaining that she had encountered complications of pregnancy. In May of 1979, the Farrs first consulted their present counsel, Wayne Arnett, about the refusal of Occidental to pay their claim. The appellant suggests that Arnett had a statement from the attending physician and the hospital records shortly after the Farrs first consulted him. The letter to Arnett from the doctor, however, bears a date of January 21, 1980. In any event, Arnett did not contact Galbraith & Green or Occidental to request payment of the claim and he did not provide them with any information about his client's treatment. In October, 1979, suit was filed. After Occidental had been sued, which was its first actual notice of the Farrs' claim, it requested a statement from the Farrs' doctor and upon receipt thereof acknowledged responsibility for payment of the remainder of the claim. This occurred by April 1, 1980.

■ The appellant seems to be asking us to hold, as a matter of law, that the appellees and their attorney deliberately refused to forward the information from the attending physician to Galbraith & Green so that the Farrs' bad faith claim would mature. The record arguably supports that conclusion. We think the conduct of the Farrs and their counsel presented a question of fact for resolution by the jury. At one point in the argument, in discussing the attorney's fees as an item of damage, counsel for Occidental said:

A phone call early in May, when the—or late in May when the documents were received for counsel's review could—as he had told her, 'If I can settle this for you in a few hours, I will charge you an hourly rate; otherwise it will have to be

on a contingency fee.' And you remember her testifying to that effect. He never contacted anybody, he never tried to get anybody to settle the case, he never told anybody he had any information. If he had, the claim would have been paid, a lawsuit wouldn't have been necessary, a contingency fee wouldn't have been necessary, and $1,300 would not have come out of the $3,900 that the Farrs received. That's not Occidental's fault.

To counter this, counsel for the Farrs argued that the appellees had done all that was reasonably necessary to acquaint the insurance company with their claim and that the request to Arnett from the insurer's counsel after the lawsuit had been filed was simply a stratagem to make it appear that the company still needed additional information. This whole facet of the case was thrashed out at trial and resolved by the verdict.

### DAMAGE ISSUES

The appellant claims that the evidence will not support the award for damages. We will discuss each specific damage issue separately.

### AMOUNTS NOT PAID UNDER THE POLICY

■ When Occidental did finally pay the Farrs' bill, it apparently used the bill the hospital had first sent and overlooked or ignored a supplemental charge of $36.50. The payment was thus arguably short by the amount of $29.20 (80% of $36.50). The company claimed that this was offset by an overpayment of $200. The supposed overpayment was, however, contested. Since the jury's award for compensatory damages included the odd amount of $.20, it must have accepted the Farrs' view of the evidence on this point. Therefore, we must do the same.

### ATTORNEY'S FEES

■ Of the amount ultimately paid under the policy, the sum of $1,300 went to pay attorney's fees incurred in the effort to effect payment. For the reasons stated in our resolution of the question of the attorney's conduct, this was an actual damage suffered by the Farrs.

### LOSS OF CREDIT REPUTATION

The Farrs also made a claim for damage to their credit reputation. The only evidence on this point was that the Farrs could not pay their medical bills when they came due. They point out that when Mrs. Farr returned to Doctor's Hospital for surgery some five months after the baby was born, she was required to make a cash deposit on admission because her previous bill had not been paid. At the time she was required to make the deposit, however, the previous bill had not been submitted to Galbraith & Green for payment. There was no evidence that any creditor had refused to provide any service or reported the appellants' late status to any credit bureau.

■ Actual damages for a loss of or injury to credit are recoverable. *Mead v. The Johnson Group, Inc.*, 615 S.W.2d 685 (Tex.1981). Speculative or uncertain damages, however, will not support a judgment and proof of the fact of damages must be of a higher order than proof of the extent thereof. *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 446 P.2d 458 (1968). Nothing in the evidence here, except speculation, suggests that the plaintiffs actually suffered any damage to their credit. It was error to allow the jury to consider an award for damage to credit reputation.

The appellants made a Motion for a Judgment N.O.V., or in the alternative a New Trial or a Remittitur. With respect to damages to credit reputation, the court erred in failing to grant the motion. We therefore remand the case with instructions to the trial court to grant a remittitur or, if the Farrs reject that, a new trial limited to the issue of compensatory damages. *See* Rule 59(i), Arizona Rules of Civil Procedure.

## DAMAGES FOR EMOTIONAL DISTRESS

The trial court instructed the jury that it could award damages for the Farrs' anxiety, emotional distress and embarrassment. Appellants cite *Davis v. First National Bank of Arizona*, 124 Ariz. 458, 605 P.2d 37 (1979), and say that the instruction was improper because an award for emotional distress must be predicated upon a loss of property. Our conclusion that the evidence supported a finding that the Farrs suffered a loss of property resolves that issue.

The appellants also argue that since there was no intentional infliction of emotional distress and no outrageous conduct, the appellants were not entitled to an instruction on emotional distress. By referring to the separate tort of intentional infliction of emotional distress, where outrageous conduct is required, the appellants have confused the standard for damages recoverable in a claim for bad faith.

In *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), the California Supreme Court held that once a plaintiff has proven a loss of property he can also recover damages for emotional distress. The court carefully delineated intentional infliction of emotional distress from emotional distress caused by an insurer's bad faith. The court rejected the suggestion that "[t]he conduct of the insured must be 'outrageous' or that the mental distress must be 'severe'." 9 Cal.3d at 579, 108 Cal.Rptr. at 489, 510 P.2d at 1041. This was more recently explained in *Richardson v. Allstate Insurance Co.*, 117 Cal.App.3d 8, 13, 172 Cal.Rptr. 423, 426 (1981), where the court noted:

> Breach of the implied covenant of good faith is actionable because such conduct causes financial loss to the insured, and it is the financial loss or risk of financial loss which defines the cause of action. Mental distress is compensable as an aggravation of the financial damages, not as a separate cause of action.

We conclude that damages for emotional distress may be awarded even though the defendant did not intentionally cause the distress and even though the distress was not severe. The concern in a bad faith case is "with mental distress resulting from a substantial invasion of property interests of the insured and not with the independent tort of intentional infliction of emotional distress." *Gruenberg*, 9 Cal.3d at 580, 108 Cal.Rptr. at 489, 510 P.2d at 1041. The primary reason for precluding recovery of mental distress damages "is that to permit recovery of such damages would open the door to fictitious claims." *Crisci v. Security Insurance Co.*, 66 Cal.2d 425, 434, 58 Cal.Rptr. 13, 19, 426 P.2d 173, 179 (1967). In the case of bad faith, however, "where ... the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of fictitious claims is reduced...." *Crisci, supra.* The rationale for allowing damages for emotional distress without a showing of outrageous conduct or severe distress, once a loss of property is proven, is sound. We realize that some courts have adopted a different standard. *See Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978).

## PUNITIVE DAMAGES

The appellants argue that this is not a proper case for punitive damages. Their first point is that the plaintiffs did not prove the actual damages necessary to support an award of punitive damages. This evaporates in view of our ruling on compensatory damages.

Occidental proceeds to argue that evidence sufficient to support a finding of bad faith will not, without more, justify an award of punitive damages. This majority view is reflected in cases like *Anderson v. Continental Insurance Co., supra*, where the court said that even though the evidence supported an award for bad faith, the wrong had to be inflicted under circumstances of aggravation, insult, cruelty, vindictiveness or malice before an award for punitive damages is permissible. *See also Benke v. Mukwonago-Vernon Mutual Insurance Co.*, 110 Wis.2d 356, 329 N.W.2d

**8**

243 (App.1982). The criteria for such an award often seem to differ only semantically. *See e.g. Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir.1978) (fraud, malice, gross negligence or oppressive conduct); *San Jose Production Credit Ass'n v. Old Republic Life Insurance Co.,* 723 F.2d 700 (9th Cir.1984) (oppression, fraud or malice); *Smith v. Standard Guaranty Insurance Co.,* 435 So.2d 848 (Fla.App.1983) (deliberate, overt and dishonest dealing); *Hoskins v. Aetna Life Insurance Co.,* 6 Ohio St.3d 272, 452 N.E.2d 1315 (Ohio 1983) (actual malice).

On the other hand, a few courts allow punitive damages without requiring evidence of anything more than is needed to support the bad faith claim. The best illustration of this view is found in *Trimper v. Nationwide Insurance Co.,* 540 F.Supp. 1188 (D.S.C.1982), where a claim for theft of property from an automobile was denied by the insurer because the police report showed that there had been no sign of forcible entry into the automobile. The insurer refused to send a representative to inspect the car when the insured insisted that there were small cuts on the rubber molding around the driver's window. There was virtually no effort to investigate the claim and the court found that the insurer put the entire burden of investigation on the plaintiff, observing that "the Defendant did not reasonably know, nor did it care, whether its cause or excuse for refusing to pay Trimper's claim was just." 540 F.Supp. at 1194.

In arriving at its decision, *Trimper* quoted the Mississippi Supreme Court's opinion in *Standard Life Insurance Co. v. Veal,* 354 So.2d 239 (1978), as follows:

> If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured

to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely.

540 F.Supp. at 1195, *quoting Veal,* 354 So.2d at 248.

■ We are puzzled by the court's reference in *Veal* to the idea that if punitive damages were not awardable the insurer's liability would be limited to the policy limits plus interest. It was this rationale that the *Trimper* court applied uncritically. An insured's recovery in a bad faith case is *not* limited to the policy limits plus interest. Instead, the insured would be entitled to the amount due under the contract, to consequential damages, and to attorney's fees. While consequential damages might be modest or nonexistent in many bad faith cases, in others they are substantial and represent a considerable deterrent to a refusal to pay. *See Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982).

■ We think the better rule is that before punitive damages are awardable the evidence must reflect something more than the reckless disregard that is needed to support the bad faith claim. We agree with the court in *Neal v. Farmers Insurance Exchange,* 21 Cal.3d 910, 148 Cal. Rptr. 389, 582 P.2d 980 (1978), and find that an award of punitive damages requires examination of both motive and intent. We will attempt to define what conduct will suffice for punitive damages.

■ Fraud will suffice. Broadly defined, fraud would encompass a failure to deal in good faith; accordingly, we mean, as an example only, fraud of the type that existed in *Henderson v. United States Fidelity & Guaranty Co.,* 695 F.2d 109 (5th Cir.1983), where, the insurer concealed the existence of a policy.

■ Deliberate, overt and dishonest dealings will support punitive damages. *Smith v. Standard Guaranty Insurance Co.,* 435 So.2d 848 (Fla.App.1983). This would encompass a willful and knowing failure to process or pay a claim known to be valid.

■ Oppressive conduct will support punitive damages. *See and compare Bostwick v. Foremost Insurance Co.,* 539 F.Supp. 517 (D.Mont.1982); *Ali v. Jefferson Insurance Co.,* 5 Ohio App.3d 105, 449 N.E.2d 495 (1982); *Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir. 1978). The cases fail to define what is meant by oppressive conduct, but a good example would encompass the situation where the insured's loss has made him desperate to settle, and the insurer is specifically aware of this vulnerability and plays upon it while recklessly failing to investigate, process or pay a claim.

■ Insult and personal abuse will suffice. *Benke v. Mukwonago-Vernon Mutual Insurance Co., supra.*

■ The question of whether punitive damages are justified should be left to the jury if there is any reasonable evidence which will support them. The evidence, however, must be more than slight and inconclusive such as. to border on conjecture. *Nichols v. Baker,* 101 Ariz. 151, 416 P.2d 584 (1966). Where the trial court has submitted the issue to the jury on evidence which is not sufficiently conclusive, an appellate court may correct the error. *See Butane Corp. v. Kirby,* 66 Ariz. 272, 187 P.2d 325 (1947).

In several cases quite similar to this one, appellate courts have held that punitive damages are not merited. *Benke v. Mukwonago-Vernon Mutual Insurance Co., supra,* is one of them. There, an insurance company refused to pay for windstorm damage to a stable, claiming that the collapse of the building was due to snow, a peril not covered by the terms of the policy. The owner of the stable claimed that the company had failed to exercise proper care in investigating the claim. The evidence showed that a representative of the insurance company immediately took the posture that the damage was due to snow. Without investigating or even asking the owner for facts, he informed the owners that there was no coverage. When the owners advised him that the snow had been regularly shoveled from the roof, the insurer's representative still insisted that there was no coverage. *Benke, supra.*

Thereafter, the representative did visit the site but elicited no information from the owners. An adjuster who had accompanied him attributed the loss to *wind* and snow and an architect who was hired by the insurer reported that the damage was due to wind. The architect was told by the company that his report was irresponsible and he was fired. The court concluded that the clear inference to be drawn from this was that the company was not interested in a neutral investigation. The court affirmed the compensatory damages but reversed an award of punitive damages. Relying on *Anderson, Benke* held that punitive damages are awardable only where there is a showing of evil intent, wanton disregard of duty, gross or outrageous, insulting, cruel, vindictive or malicious conduct. The court then said:

> There is no 'malice' shown toward the Benkes. We see no evidence of evil intent to oppress the Benkes in a vindictive manner. Rather, it is a case of an insurance company making up its mind right away that the claim was 'debatable' and sticking to its belief until it could find an expert to back its hypothesis.... Here, they made up their minds before there was a question of fact or law to support their claim. Yet, there is no evidence of vindictiveness and malice, and, therefore, we reverse this portion.

*Benke,* 110 Wis.2d at 365–66, 329 N.W.2d at 248.

In *McLaughlin v. Connecticut General Life Insurance Co.,* 565 F.Supp. 434 (N.D. Cal.1983), the defendant company had issued a medical insurance policy to the McLaughlins which provided coverage for medical expenses to the extent the same were recommended by a physician and were essential for the treatment of sickness. Mrs. McLaughlin developed lung cancer. She rejected her doctors' advice that she undergo chemotherapy and instead underwent so-called "immuno-augmentative" therapy in the Bahamas. The company's sole basis for denying the claim

for the expense of treatment was that the therapy was not approved by the Food and Drug Administration. 565 F.Supp. at 437–38.

Mrs. McLaughlin wrote the company advising it that one of her physicians was "impressed" by her improved condition. The company denied the claims. Thereafter, another of Mrs. McLaughlin's doctors wrote the company and advised it that Mrs. McLaughlin would survive longer than the average person who suffered from cancer and told the company that she may have benefited from the treatment. *Benke, supra.*

The company's efforts to investigate the claim were negligible. The company did not attempt to contact Mrs. McLaughlin's doctors or the facility in the Bahamas that treated her. It did not request her medical records and was ignorant as to whether or not the treatment required prescription by a physician in the Bahamas. The company's legal department had supplied it with an opinion that its position was questionable. 565 F.Supp. at 439–40.

The court found that the company had breached its duty to deal in good faith but refused to award punitive damages. It cited *Silberg v. California Life Insurance Co.*, 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974) and went on to observe:

> Plaintiffs have offered no evidence which suggests that defendant intended to injure them or that it consciously disregarded the fact that it had no basis for its denial and that its denial would injure plaintiffs. Though the evidence demonstrates that defendant acted cavalierly in handling plaintiffs' claim, it had valid reasons for being disinclined to grant the claim. To allow punitive damages in this case would be to hold that every time an insured acts unreasonably in denying a claim, its actions give rise to punitive damages. This is not a punitive damages case.

521 F.Supp. at 454.

Of course, we realize that the district judge in *McLaughlin* was making a value judgment at the trial level. We nonetheless find his reasoning instructive. *See also Smith v. Standard Guaranty Insurance Co.*, 435 So.2d 848 (Fla.App.1983) (more than bungling and arbitrary behavior is needed for punitive damages—although Florida otherwise bars punitive damages in first party bad faith claims.)

■ Distilled, what happened here amounted to bungling and negligence on the part of Occidental. While the company originally had a ground to question the claim because the claim form described the delivery as a normal one, it should have investigated further. Mrs. Robinson's letter was ambiguous as to who was to make further inquiry of the doctor. It is important to recognize, however, that the Farrs, by their own admission, were not sure whether or not they were to supply the doctor's report. Instead of resolving the question by inquiry, they sought out a lawyer. The award for punitive damages must be set aside.

## PASSION AND PREJUDICE

■ The appellants argue that the verdicts were the result of passion and prejudice. It is true that the plaintiffs do not seem to have suffered the extreme inconvenience, actual damage, anxiety and annoyance that sometimes occurs in cases of this nature. *See,* for example, *Sparks v. Republic National Life Insurance Co., supra.* Nonetheless, we cannot say that the verdict for compensatory damages was the result of passion and prejudice.

## THE JUDGMENT NOTWITHSTANDING THE VERDICT IN FAVOR OF GALBRAITH & GREEN

After the jury returned a verdict in favor of the Farrs and against both defendants jointly and severally for $13,000 in actual damages and for $20,000 in punitive damages against Galbraith & Green, the trial court granted Galbraith & Green's motion for a judgment notwithstanding the verdict. Citing *Gruenberg, supra,* the trial court decided that Galbraith & Green was not a party to the insurance contract and

therefore was not bound by the implied covenant of good faith and fair dealing.

It is true that *Gruenberg* held that non-insurer defendants who administer claims are not parties to agreements, thereby relieving them of any implied duty of good faith and fair dealing. While an argument can be made that *Gruenberg* is unsound in that respect, *sce Hale v. Farmer's Insurance Exchange*, 42 Cal.App.3d 681, 704, 117 Cal.Rptr. 146, 162 (1974) (Kerrigan, J., dissenting), we need not explore that in depth because we believe that our supreme court has settled the issue in *Sparks v. Republic National Life Insurance Co., supra.*

*Sparks* turns upon the idea that the insurer and its agent are engaged in a joint venture so that each is jointly and severally liable with the other for a bad faith refusal to pay. Occidental, citing the elements listed in *Ellingson v. Sloan*, 22 Ariz.App. 383, 386, 527 P.2d 1100, 1103 (1974), says that not all the features of a joint venture are present here. Looking to those features, we note that here there was no proof of profit and loss sharing and no proof of a joint right to control. Thus, the classical elements of a joint venture are missing. But if that is true here, it was also true in *Sparks*. In *Sparks* the court found that a company that issued certificates of coverage, billed and collected premiums, handled the investigation and payment of claims, and distributed brochures to induce the purchase of policies was engaged in a joint venture with the insurer so that both owed a common duty to the insureds to act in good faith. 132 Ariz. at 540, 647 P.2d at 1138.

■ In this case Galbraith & Green marketed Occidental's policy. It collected premiums and handled claims according to guidelines provided by Occidental. Occidental did not become involved in the management of claims unless unusual circumstances were involved. Indeed, in this case, Occidental knew nothing of the Farrs' claim until after it had been sued. Galbraith & Green received a commission on premiums collected as well as a percentage of renewal commissions. We see no distinction that would justify a departure from *Sparks.*

■ Galbraith & Green's argument that the parties "stipulated" that it was a mere "agent" is not dispositive. Each party in a joint venture is the "agent" of the other. *West v. Soto*, 85 Ariz. 255, 336 P.2d 153 (1959). The trial court erred in granting judgment notwithstanding the verdict for Galbraith & Green.

### THE FARRS' ATTORNEY'S FEES

■ After prevailing before the jury, the Farrs petitioned for an award of attorney's fees pursuant to A.R.S. § 12–341.01. The court denied the Farrs' petition, apparently for the reason that the claim did not arise out of contract. Thereafter, the supreme court decided *Sparks*, which allows for an award of attorneys' fees in cases of this nature. Upon remand the appellees may seek attorneys' fees for work done in the trial court. In our discretion, we decline to award such fees on appeal.

The judgment against Galbraith & Green for compensatory damages is reinstated.

The judgment for compensatory damages against Occidental, except as to damages to credit reputation, is affirmed. This cause is remanded to the trial court to grant a remittitur or, if the Farrs reject the same, a new trial limited to the issue of compensatory damages.

The judgments as to punitive damages against both Occidental and Galbraith & Green are vacated.

BROOKS and EUBANK, JJ., concur.