REPUBLIC INSURANCE COMPANY, Appellant, v.
JACK A. HIRES, Respondent.

No. 19426

May 2, 1991 810 P.2d 790

*Beckley, Singleton, DeLanoy, Jemison & List,* Las Vegas;
*LeBoeuf, Lamb, Leiby & MacRae* and *John Frye* and *R. Scott
Puddy,* San Francisco, California; *Maurice Rosenberg,* Professor
of Law, Columbia University, New York, New York, for Appel-
lant.

*Victor G. Drakulich,* Reno; *Hibbs, Roberts, Lemons, Grundy
& Eisenberg,* Reno, for Respondent.

*Lionel Sawyer & Collins* and *M. Kristina Pickering,* Reno;
*Gibson, Dunn & Crutcher* and *Larry L. Simms,* Washington,
D.C., for Amicus Curiae American Insurance Association and
Coalition for Available/Affordable Liability Insurance.

*Hamilton & Lynch,* Reno, for Amicus Curiae Nevada Trial
Lawyers Association.

318

## OPINION

By the Court, YOUNG, J.:

A jury awarded Jack A. Hires $22.5 million in punitive damages because of the manner in which Republic Insurance Company treated Hires in connection with payment of an insurance claim.

### FACTS

Before leaving on a weekend trip to California, Hires secured his home in Sparks and asked his neighbor, Doug France, to maintain the swimming pool. Soon after reaching his destination, Hires received a telephone call from France who told him that his house had been "robbed." Hires immediately returned to Sparks. He found extensive damage to the residence and furniture; in addition, several items had been stolen.

Hires notified Republic Insurance Company of the loss. The homeowner's coverage with Republic was a basic homeowner's policy with a replacement cost endorsement for an additional cost.

On Monday, Terry Hunt, an independent insurance adjuster hired by Republic, went to the house to inspect damages. After reviewing the damage, Hunt told Hires that a contractor would take care of it. Hunt recommended that Hires contact UTE Construction Company regarding repairs.

The following night, Gary Schizler from UTE went to the Hires home and told Hires to replace the damaged furniture. Relying on the instructions of Hunt and Schizler, Hires threw away the damaged furniture and bought new replacement furniture, partially with cash and on credit. Hires gave the receipts to Hunt, who indicated that he would take care of it.

Two weeks later, Hunt informed Hires that Republic would not reimburse Hires the full $2,242.82 for the new furniture, but that Republic would pay only $400, which is what Republic estimated

it would cost to reupholster the furniture. Republic finally paid Hires only sixty-five percent of the $400 because Republic claimed Hires lacked documentation, even though there had been no question raised as to Hires' ownership of the furniture.

The next problem Hires encountered was with regard to his bedroom furniture. Hires estimated that it would cost $580 to replace the furniture. Republic estimated a replacement cost of $300 and offered to pay only sixty-five percent of the $300. Republic's excuse for the across-the-board thirty-five percent reduction in payments to Hires was that Hires did not have sufficient documentation to establish price and ownership on some items. Even the items for which there was sufficient documentation were paid for by Republic at sixty-five percent of replacement value. According to Republic claims adjuster Trisha Funk, it was customary for Republic to begin negotiations at a reduced figure, leaving the policyholder with the obligation of arguing for a larger amount.

Moreover, Republic refused to pay any amount to Hires until four months after the burglary. Hires testified this created financial difficulties. Hires also testified that he experienced marital difficulties before the experience with Republic and that Republic's treatment of him and the ensuing financial difficulties finally resulted in his divorce.

In November 1986, four months after the burglary, Hires contacted legal counsel who sent a letter to Terry Hunt demanding payment of the claim. Republic continued its refusal to pay. By Christmas, Hires had experienced major financial difficulties because of the payments due on replacement furniture that he had purchased and the repairs which he had paid.

Finally, on December 30, 1986, Republic gave Hunt authority to settle a claim for damage for loss of contents in the amount of $7,238 which was $5,800 under the demand by Hires. Hires accepted payment while reserving his right to contest the amount paid.

Republic's conduct with regard to its investigation of the burglary was also an issue at trial. Officer Schmidt of the Sparks Police Department investigated the burglary and concluded that, because of the large amount of vandalism associated with the burglary, the perpetrator might have been a member of the Hires family or someone with a great dislike for the family. When Officer Schmidt's suspicions were satisfied, the police investigation was closed.

Republic apparently did not agree with Officer Schmidt's conclusion and conducted a full neighborhood investigation into Hires' possible involvement in the burglary. Part of the investiga-

tion concerned Mrs. Hires' alleged extramarital activities and possible involvement in the burglary. Hires testified that, prior to the investigation, he enjoyed a very close relationship with people in the neighborhood. After the investigation, he perceived a change in his neighbors' attitude toward him and his family.

Hires stated that his children mentioned remarks by their friends indicating that the Hires family had been involved in the burglary. Republic finally concluded that the family had no involvement in the burglary. Terry Hunt, who performed the investigation for Republic, testified that ordinarily he would not have conducted such a thorough investigation, but that Republic was usually more willing than other companies to investigate the background of its own insureds. The investigation apparently ended in November 1986.

About eighteen months after the burglary and after the lawsuit was filed, Republic again investigated the incident. An investigator employed by Republic's attorney contacted Doug France and asked if France had collaborated with the Hires family in committing the burglary. The investigator asked France if he had been involved in a relationship with Mrs. Hires. France interpreted this question as referring to a sexual relationship. This investigation was conducted throughout the neighborhood. In December 1987, pursuant to the investigator's request, the Sparks Police Department reopened the investigation, but closed it again upon verification of information previously received.

Hires brought suit against Republic based on breach of contract, misrepresentation, bad faith, negligence and invasion of privacy. The jury awarded Hires $410,000 in compensatory damages and $22.5 million in punitive damages.

On appeal, Republic raises a number of claims of procedural error. We conclude that these claims were either not properly preserved for review or that, if objection was properly made, there was no abuse of discretion by the trial judge. Moreover, we have reviewed the record and conclude that evidence supported the award of compensatory damages. We will now address the question of punitive damages.

Republic raises a constitutional argument regarding punitive damages, but we reject this argument because the availability of punitive damages is accepted as settled law by nearly all state and federal courts. Pacific Mutual Life Ins. Company v. Haslip, ...... U.S. ......, 59 U.S.L.W. 4157 (March 4, 1991). Our court has stated that punitive damages provide a benefit to society by punishing undesirable conduct not punishable by the criminal law. Ace Truck v. Kahn, 103 Nev. 503, 746 P.2d 132 (1987).

NRS 42.005 authorizes an award of punitive damages where the defendant has been guilty of oppression, fraud or malice. If we read the record in the light most favorable to Hires and least favorable to Republic, we conclude evidence indicates Republic was guilty of oppressive conduct. K Mart Corp. v. Ponsock, 103 Nev. 39, 732 P.2d 1364 (1987).

After hearing all the evidence in the case, the trial judge summarized the case as follows:

> This claim was not one in the gray area, but rather was one that reasonable persons would agree *should* [emphasis in original] be paid . . . . Republic insisted on an across the board reduction of the claim. Furthermore, the testimony of Terry Hunt, by way of his first deposition, established that this *conduct was the unqualified policy of Republic, particularly with regard to lower and middle income policyholders, who are less likely to dispute Republic's position.* This conscious wrongdoing on the part of Republic, along with the malicious intent, is what the jury sought to punish. *And the jury knew that a substantial sum was necessary to deter further conduct by a wealthy, powerful and impersonal corporation.*

(Our emphasis.)

From the above comments by the court and the record, it is clear that Republic was guilty of oppressive behavior. Evidence showed that the net worth of Republic was approximately $172 million. We conclude that $22.5 million is a larger sum than is necessary in this case to serve as a deterrent. Although we are reluctant to substitute our judgment for that of the trier of fact on punitive damages, we conclude that the amount awarded by the jury is clearly disproportionate to the blameworthiness and harmfulness in the conduct of Republic under the circumstances of this case. *Ace Truck,* 103 Nev. at 509, 746 P.2d at 136-37.

Based on the standards established in *Ace Truck* and after considering all of the factors enumerated therein, we conclude that in this case any punitive damage award in excess of $5 million would be unreasonable and disproportionate to the behavior of Republic. An award of more than $5 million would be more than is necessary to deter Republic and others from engaging in this kind of oppressive behavior.

We affirm the judgment of the trial court in all respects except for the award of punitive damages. The judgment for punitive damages is reduced from $22.5 million to $5 million.

MOWBRAY, C. J., and STEFFEN, J., concur.

SPRINGER, J., with whom ROSE, J., agrees, concurring in the judgment:

Although I am willing to join with the other members of the court in ordering a reduced $5 million punitive damage judgment in favor of Hires, I am unwilling to sign the majority opinion because I do not think that it accurately portrays the magnitude of the oppressive conduct engaged in by Republic Insurance Company.[1] The majority opinion as it now reads does not in my view

---

[1]Rather than state the facts in detail in the body of this concurring opinion I will summarize the facts in this note because I think the reader may get a better grasp of Republic's blameworthiness upon reading of the way in which the company treated the Hires family.

While the family was out of town they received a phone call from a neighbor, Doug France, advising that the family home had been "robbed." Hires returned immediately to his Sparks home. Upon arriving at the house he found extensive damage to the residence and furniture. Several items had been stolen, the waterbed had been punctured, and other pieces of furniture and portions of the house had been vandalized.

Hires notified his homeowner's insurance carrier, Republic Insurance Company, about the loss. The homeowner's coverage which Hires had with Republic was a basic homeowner's policy with a replacement cost endorsement made available by Republic for an additional cost.

On Monday, Terry Hunt, the independent insurance adjuster hired by Republic, went to the house and observed the damages. After Hunt made a review of the damage to the house and its contents, Hires asked Hunt what to do about the furniture. Hunt told him to leave it for the contractor to take care of. Hunt recommended that Hires contact UTE Construction Company about the repairs.

The next night, Gary Schizler from UTE went to the Hires' home and told Hires to replace the damaged furniture. Based on the instructions of Hunt and Schizler, Hires threw away the damaged furniture and bought new replacement furniture partially with cash and the rest on credit. Hires gave the receipts to Hunt, and Hunt indicated that he would take care of it. After approximately two weeks, however, Hunt informed Hires that Republic would not reimburse him the full $2,242.82 for the new furniture, but that Republic would pay only $400.00, which is what Republic estimated it would cost to reupholster the furniture. Republic finally paid Hires only sixty-five percent of the $400.00 because Republic claimed Hires lacked documentation, even though there had been no question concerning Hires' ownership of the furniture.

The next problem Hires encountered was with regard to his bedroom furniture. Hires estimated that it would cost $580.00 to replace the furniture while Republic estimated a replacement cost of $300.00, but Republic would pay only sixty-five percent of the $300.00. Republic's excuse for the across-the-board thirty-five percent reduction in payments to Hires was that Hires allegedly did not have sufficient documentation to establish price and ownership on some items. Even the items for which there was sufficient documentation were paid for by Republic at sixty-five percent of their replacement value. According to Republic claims adjuster Trisha Funk, it was customary for Republic to begin negotiations with an insured at a reduced figure, leaving the policyholder with the obligation of arguing for a larger amount. At trial, Hires contended that Republic had refused to pay, in all, about $5,800.00 which was due him under the policy.

Republic refused to pay any amount to Hires until almost four months

justify a punitive award of even $5 million; it is for this reason that I file a separate, concurring opinion.

---

after the burglary. Hires testified that this caused him financial difficulties. Hires also testified that he had marital difficulties before the experiences with Republic and that Republic's treatment of him and the ensuing financial difficulties finally resulted in his divorce.

Hires contacted legal counsel in November 1986, four months after the burglary, and counsel sent a letter to Terry Hunt demanding payment of the claim. While Hunt realized that Republic should pay the claim and requested Republic to do so, Republic continued in its refusal. By Christmas, Hires had experienced major financial difficulties because of the payments due on the replacement furniture he had bought and the repairs he had paid for.

Finally, on December 30, 1986, Republic gave Hunt authority to settle for $7,238.00, which was well under the demand made by Hires. Republic indicated to Hires, through Terry Hunt, that the $7,238.00 was a take-it-or-leave-it offer. Hires accepted payment while preserving his right to contest the amount paid.

Republic's conduct with regard to its investigation of the burglary also was an issue at trial. Officer Schmidt of the Sparks Police Department investigated the burglary and concluded that, because of the large amount of vandalism associated with the burglary, the perpetrator might have been a member of the Hires family or someone with a great dislike for the family. Officer Schmidt's suspicions were satisfied, however, when he found out that Hires had been out of town when the burglary took place.

Republic apparently did not agree with Officer Schmidt's conclusion, though, and conducted a full neighborhood investigation into Hires' possible involvement in the burglary. Part of the investigation involved Mrs. Hires' alleged extramarital activities and her potential involvement in the burglary. Hires testified that prior to the investigation he had a very close relationship with the people in the neighborhood, but after the investigation he perceived a change in his neighbors' attitude toward him and his family. He stated that his children mentioned remarks by their friends that the family had been involved in the burglary. Republic finally concluded that the Hires family had no involvement in the burglary. Terry Hunt, who conducted the investigation for Republic, testified that he would not have done such a thorough investigation except that Republic was usually more willing to investigate the background of its own insureds than other companies. This investigation apparently ended in November 1986.

Republic again investigated the burglary about eighteen months after the burglary and after the lawsuit in this case had been filed. An investigator contacted Doug France and asked if France had collaborated with the Hires family in committing the burglary. The investigator asked France if he had a relationship with Mrs. Hires, which France interpreted as meaning a sexual relationship. This investigation was conducted throughout the neighborhood. In December 1987, the investigator requested that the Sparks Police Department reopen the criminal investigation. The police department did reopen the case but closed it again upon verification of the information that it had previously received.

Hires brought suit against Republic based on breach of contract, misrepresentation, bad faith, negligence, and invasion of privacy. The jury awarded Hires $410,000.00 in compensatory damages and $22.5 million in punitive damages. This award equals approximately thirteen percent of Republic's $172 million net worth.

I do not think that the majority opinion accurately portrays, as it should, how awful Republic really was in its dealings with Hires and its other insurance policyholders. As the trial court concluded, Republic was guilty of "conscious wrongdoing" and "malicious intent"; but what aggravates the wrongdoing in this case is the massive oppression engaged in by Republic and Republic's focus on defeating the legitimate claims of its low income, relatively powerless clientele. What the company was doing was to underpay its claimants on an "across the board" basis by starting "negotiations" with claimants at sixty-five percent of the true value of the claim as assessed by the company itself, and then negotiating downward from there.[2] Shortchanging its policyholders was, according to the trial judge, "the unqualified policy of Republic, particularly with regard to lower and middle income policyholders, who are less likely to dispute Republic's position." There is evidence to support the conclusion that this oppressive policy was employed in over one million claims per year.[3] The amount "shaved" off (to use a term coined by one of the witnesses) of Hires' legitimate claim was around $5,800.00. If, for example, only a trifling $100.00 were shaved from each of a million claims each year, we would have a staggering fraud on the company's policyholders of $100 million per year. This kind of fraud, this kind of oppression is indeed deserving of punishment. The trial court properly observed that policyholders should not have to "be confronted with the unreasonable and outrageous behavior of an insurance company." The trial court specifically concluded that the jury was justified under the circumstances in awarding $22.5 million as being "necessary to punish the tortfeasor and to deter others from similar misconduct." Perhaps, as my colleagues conclude, $5 million (which is less than three percent of Republic's net worth) is enough to

[2]This course of conduct was revealed by Republic's own employees. One of Republic's insurance agents testified that Republic deliberately treated its customers differently depending on their socio-economic status. In addition, one of Republic's claims adjusters explained that it was *customary* for Republic to begin negotiations with an insured with a reduced figure, leaving the policyholder with the obligation of arguing for a larger amount.

[3]Prior to trial, Hires requested that Republic produce all of its complaints that were "similar in nature to the allegations in this litigation, or "reasonably related to the allegations in this litigation." In response to this discovery request, Republic presented Hires with a large box of complaints. Over 100 of these specific complaints were admitted into evidence at trial. These 100 claims provide a rough sample of cases similar to the case before us. We can readily see from these complaints what Republic was doing, but we cannot tell how much money was bilked from its insurance claimants. Hires' counsel suggested a minimum of $20 million, but this sum is low when we consider that over one million claims a year are presented to the company.

punish Republic and to deter other insurance companies from similar fraudulent and oppressive misconduct; but I am not willing to concur in such a judgment without at least putting on the record a more detailed account of the abominable misconduct of which this insurance company was guilty in this case. A business practice more reprehensible than that practiced here would be hard to imagine. It is difficult to envision in the business world anything more repugnant that the picture of a group of corporate executives charged with the management of a giant insurance company sitting down to plan how the company can prosper by refusing to pay legitimate claims. Imagine: "First, we will take every claim and reduce it to sixty-five percent of what we think the claim is actually worth. Then, by delay, harassment, and intimidation we will force claimants to accept an amount lower than sixty-five percent of the claim's true value, if possible. This scheme will work particularly well in cases where claimants are short of money and must accept inadequate compensation in order to survive."

The ugly spectacle of Republic's behavior in systematically depriving the powerless of their legitimate indemnification claims is, to say the least, troubling. Such conduct exemplifies in the extreme the oppressive behavior contemplated by NRS 42.005 as warranting the award of punitive damages.[4] The hallmark of this

---

[4] I believe that the majority should have placed more emphasis on the oppressiveness of Republic's behavior. Oppression was defined for the jury in terms of Republic's "*conscious disregard for the rights of others.*" This definition, however, and the definition of oppression given in our past cases falls short of capturing the true essence of oppression. This court has defined oppression as "a conscious disregard for the rights of others which constitutes an act of subjecting plaintiffs to cruel and unjust hardship." United Fire Insurance Co. v. McClelland, 105 Nev. 504, 512-13, 780 P.2d 193, 198 (1989), *reh'g denied* (Nov. 11, 1989); *see also* Ainsworth v. Combined Ins. Co., 104 Nev. 587, 590, 763 P.2d 673, 675 (1988). This description covers Republic's behavior in this case, but it does not in my opinion adequately cover the most important, most essential element of true oppression, namely, the power differential between the oppressor and the oppressed. The etymological root of the word op*press*ed is the *press*ing or crushing denotation, the sense of the stronger party pressing down on and crushing the weaker. Webster defines oppression as the "[u]njust or cruel exercise of authority or power." Webster's New Int'l Dictionary 1710 (7th ed. 1961) (unabridged). The real gist of oppression, then, (appreciated, it would seem, by the jury in this case) is the abuse of power by the stronger over the weaker. Incorporating this idea of crushing by superior power into the language of our past cases, I would define oppression as the unjust abuse of power by one who is stronger and who, in the exercise of that greater power, consciously disregards the rights of one who is weaker, thereby causing injury by subjecting the weaker party to cruel and unjust hardship.

The failure to bring into judicial cognizance the true nature of oppression as a basis for punitive damages was recognized in Farr v. Transamerica

case is *oppression,* the use of massive economic and social power to trample on the rights of the "little guy." The concept is well captured in the first paragraph of Hires' brief:

> This case is about David and Goliath. One party is a financially weak UPS deliveryman who paid insurance premiums in order to obtain protection for his family, and whose life was shattered when his home was burglarized and vandalized. The other party is a large national insurance corporation which has millions of dollars in assets, which is a subsidiary of an even larger insurance conglomerate, and which flexed its enormous muscles in order to reduce its policyholder's claim and increase its profit.

Further aggravating the oppressive actions of this insurance company is its inexplicable failure to acknowledge, even during the appellate process, that it has done anything wrong. This remorseless attitude, combined with the contemptible conduct detailed above, sufficiently supports the lower court's firm and unequivocal declaration that Republic was deserving of very severe punishment.

I do have some concern in this case about the "windfall" of $22.5 million that would be enjoyed by Hires if this punitive award were affirmed; and this influences my decision to join with the majority's reduction of the punitive award. Also, I am concerned about just who is actually being punished by the punitive award. As noted in the margin, those actually responsible for the oppressive behavior exhibited by Republic as a corporation may go entirely unpunished.[5]

Occidental Life Ins. Co., 699 P.2d 376, 384 (Ariz.Ct.App. 1985), in which the courts' common failure to define adequately oppressive conduct was noted. The Arizona court stated: "The cases fail to define what is meant by oppressive conduct, but a good example would encompass the situation where the insured's loss has made him desperate to settle, and the insurer is specifically aware of this vulnerability and plays upon it while recklessly failing to investigate, process or pay a claim." 699 P.2d at 384. In the case now before us, we are not dealing with a company's mere failure to investigate, process or pay a claim but, rather, with an intentional, conscious company policy to avoid paying lawful claims, thus inflicting on weak and vulnerable policy holders a "cruel and unjust hardship." *United Fire,* 105 Nev. at 512-13, 780 P.2d at 198; *Ainsworth,* 104 Nev. at 590, 763 P.2d at 675.

[5]Republic is a large subsidiary company with assets of about $172 million. If this were a personal, not a corporate, defendant, one might not be concerned with a punishment that took $5 million, or even $22.5 million, from a rich and powerful person who preyed upon the weak and was guilty of an unjust and cruel abuse of power. In a case like this, however, it is, to some degree, the innocent, at least relatively innocent, stockholders who suffer loss for the evil doings of corporate management.

Some commentators argue that this kind of punitive damage award pun-

I have decided to join my brothers in the judgment in this case, but I admit to a certain "reluctance to substitute [my] judgment for that of the trier of fact on the issue of damages." Automatic Merchandisers, Inc. v. Ward, 98 Nev. 282, 284, 646 P.2d 553, 555 (1982). Nevertheless, even in the face of the massive corporate oppression generated by the management of Republic Insurance Company, I am willing to join with my colleagues in reducing the $22.5 million punitive award to $5 million.

---

ishes the innocent shareholder and does not have a deterrent effect on the corporate managers who actually committed the wrongful acts. They argue that if, say, as here, three percent of the net worth of a company were to be awarded to the plaintiff it would take three cents from every dollar's worth of the stock belonging to the shareholders, while the wages and salaries of the employees and officers of the corporation would remain untouched. *See* Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 841 (2d Cir. 1967).

Opponents of the "innocent shareholder" theory state that loss or decline in value of an investment is a risk that investors must assume. They argue that the shareholders should not be allowed to enjoy "ill-gotten" gains. In addition, they state that punitive damages cutting into the shareholders' pocketbooks will encourage the shareholders to exercise closer control over corporate operations. 1 J. Ghiardi & J. Kircher, *Punitive Damages Law and Practice,* § 6.10 (1988). The assertion that shareholders could be motivated to exercise close control over the corporation seems to ignore the reality, whether good or bad, that the modern multi-million dollar corporation is ruled by its directors and officers and that the individual shareholders who own just a few shares each and are not acquainted with any of the other shareholders have and want little or nothing to say concerning corporate management. It appears in this record that the principal stockholder of Republic is another corporation, and the innocent stockholder argument may not obtain here; still, it is worth noting that attention should be given to the desirability of punishing those who are really at fault.

Under the tort theory of recovery here employed, the contracting party, the company, is the only party liable in tort for breach of the implied covenant of good faith and fair dealing. There is, however, no reason why stockholders should not, in these kinds of bad faith cases, be able to pursue a recoupment of their losses. The record before us fails to identify which agents of the corporation brought about the oppressive treatment of Mr. Hires in this case. No doubt a class stockholders' action could get to the bottom of this mystery and perhaps recover the stockholders' losses from the guilty parties. A class action by defrauded claimants might also be in order in this case.