ACE TRUCK AND EQUIPMENT RENTALS, INC.; SHELL RENTALS, INC.; WILLIAM BERMAN, NANA BERMAN, CARL PECSON, AND SHIRLEY PECSON, APPELLANTS, *v.* WILLIAM KAHN, CHRISTINE ELEANOR KAHN, JOHN D. KAHN, A-1 EQUIPMENT RENTALS, INC.; THOMAS E. PHELPS AND ESTATE OF BEN F. KRAFT, DECEASED, RESPONDENTS.

No. 16350

November 30, 1987 746 P.2d 132

*Stanley H. Brown,* Reno; *Goebel, Shensa & Beale,* San Diego, California, for Appellants.

*Moran & Weinstock,* Las Vegas; *Samuel Anter,* Las Vegas; *Kelly Swanson,* Las Vegas; *Clark Barret,* San Mateo, California, for Respondents.

504

# OPINION

By the Court, SPRINGER, J.:

This opinion is principally concerned with appellants' contention that punitive damages awarded against appellants Berman and Pecson were excessive as a matter of law. Concluding that punitive damages were excessive, we state the rule applicable in such cases and order punitive damage awards reduced as excessive. The compensatory damage awards are affirmed.

The present controversy arose out of an agreement whereby Berman and Pecson sold a car rental business to the Kahns. The Kahns sued, claiming breach of contract and fraud. The jury awarded compensatory damages totalling $391,049.00 and punitive damages totalling $800,000.00. The punitive award against Berman, who had a proven net worth of $1,626,000.00, was $500,000.00. The punitive award against Pecson, who had a proven net worth of $705,700.00, was $300,000.00.

## Facts

Early in 1978, the parties began negotiations which led to an agreement whereby the Kahns would purchase from Berman and Pecson a business known as Ace Truck and Equipment Rentals, Inc. The Kahns took possession of the business in March of 1978

under an oral agreement of sale. The agreement was later reduced to a written document that was never signed by the parties. The agreement provided for a cash payment of $102,000.00 with the Kahns additionally agreeing, as part of the purchase price, to assume payments owing by the sellers on sellers' contract to purchase certain equipment.

After the Kahns took possession, they found that Berman and Pecson had been guilty of a number of misrepresentations. The misrepresentations to the Kahns included the following: a representation that the business was solvent when it was not; a representation that certain vehicles and other equipment belonged to the sellers when they did not; a representation that the accounts payable were approximately equal to the accounts receivable when in fact the two differed by more than $32,000.00; a failure to disclose that three important customer contracts had been lost prior to the consummation of the agreement; and, a false representation of the amount of depreciation taken by the sellers on the vehicle fleet prior to possession by the Kahns.

Additionally, the Kahns claimed that during the negotiation period Berman and Pecson falsely represented that they possessed, as part of the business assets being sought, a written option to purchase an adjacent, unimproved lot which was crucial to continued operation of the business.

The unimproved lot was necessary for parking space for rental vehicles. Berman and Pecson agreed that they would exercise the supposed option and then lease the lot back to the Kahns. Berman and Pecson failed to produce the promised option and failed to purchase the lot. The Kahns claimed that this defalcation made it necessary for them to gain possession of the property on their own at a greater cost than if Berman and Pecson had conformed to their agreement.

The parties to the contract sued each other. Each complaint included claims for specific performance, quiet title, conversion, fraud, and damages. The district court consolidated the two lawsuits and bifurcated the trial, trying first the equitable claims of the parties; thereafter, the fraud and damages issues were tried before a jury.[1]

---

[1]Appellants complain that by reason of the described procedures they were denied a jury trial. Since both parties requested equitable relief, neither can be allowed to object to the equitable adjudication on the ground of denial of a jury trial. *See* 5 J. Moore, *Moore's Federal Practice*, para. 38.21 (2d. ed. 1986). Also, there is no clearly refused demand for a jury trial appearing in the record. Although appellants expressed some displeasure with bifurcation at the pre-trial conference, appellants ultimately acquiesced in the bifurcated proceeding ordered by the district court. Having made no proper objection to the district court's procedural rulings, Berman and Pecson are now precluded from arguing this point on appeal. *See* Johnston v. Rosaschi, 44 Nev. 386, 194 P. 1063 (1921).

### Excessiveness of Punitive Damage Awards

NRS 42.010 authorizes an award of punitive damages where the defendant has been guilty of oppression, fraud or malice. That an award of punitive damages is allowable on the basis of fraud is not in dispute here. Although Berman and Pecson contend otherwise, we conclude that the record displays sufficient evidence of fraud so as to justify an award of punitive damages under NRS 42.010. The only cognizable question remaining is whether the amount of this award is excessive.

The proper end of punitive damages is to punish and deter culpable conduct. *Midwest Supply, Inc. v. Waters,* 89 Nev. 210, 510 P.2d 876 (1973); *Miller v. Schnitzer,* 78 Nev. 301, 371 P.2d 824 (1962). Because the purpose of punitive damages is to punish and deter, the courts in examining these awards should focus on the character of defendant's conduct rather than on the injury suffered by the plaintiff. For this reason punitive damages are not, as in the case of compensatory damages, awarded to compensate the plaintiff for harm incurred, *New Hampshire Ins. Co. v. Gruhn,* 99 Nev. 771, 670 P.2d 941 (1983), and need not bear any relationship to the compensatory damage award. *Midwest Supply,* above, 89 Nev. at 213, 510 P.2d at 879.

Punitive damages provide a means by which the community, usually through a jury, can express community outrage or distaste for the misconduct of an oppressive, fraudulent or malicious defendant and by which others may be deterred and warned that such conduct will not be tolerated. The allowance of punitive damages also provides a benefit to society by punishing undesirable conduct that is not punishable by the criminal law.

The amount of punitive damages appropriate to the stated purpose of punishment and deterrence lies in the discretion of the fact-finder. *Midwest Supply,* above, 89 Nev. at 213, 510 P.2d at 878-79. This does not mean, however, that a trial judge or jury should have unbridled discretion in setting the amount of punitive damages. The threat that the punishment inflicted will be excessive when compared to the wrong committed makes it necessary for the courts to develop standards to determine the reasonableness of punitive damages in a given case and thereby limit the upper amount that can be properly and justly awarded as punitive damages. Several such standards have been considered and applied by this court.

A review of our cases dealing with excessiveness of punitive

damages fails to reveal a standard of universal application in ruling on this question.

The most frequently cited rule is that the amount of punitive damages assessed should be sufficient to punish a wrongdoer and deter others from acting in a similar manner without financially annihilating the defendant. Phillips v. Lynch, 101 Nev. 311, 704 P.2d 1083 (1985); Hale v. Riverboat Casino, Inc., 100 Nev. 299, 682 P.2d 190 (1984); Bull v. McCuskey, 96 Nev. 706, 615 P.2d 957 (1980); Tahoe Village Realty v. DeSmet, 95 Nev. 131, 590 P.2d 1158 (1979); Caple v. Raynel Campers, Inc., 90 Nev. 341, 526 P.2d 334 (1974); Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962).

The financial annihilation rule is necessarily very restricted in its application because punitive excessiveness must ordinarily and usually fall short of total annihilation of the defendant. Obviously, a very wealthy defendant could be the subject of an unreasonable and impermissibly excessive punitive award which represented an amount far below the point of financial annihilation. This rule is available only in clear cases where the defendant is being wiped out (as in *Schnitzer,* for example, where a defendant with a net worth of $51,000.00 was mulcted in the amounts of $45,000.00 compensatory damages and $50,000.00 punitive damages) and is of little use as a rule of general application.

The other frequently recurring rule found in our cases is our holding that the amount of the award is not excessive if it does not shock our conscience. Wilson v. Pacific Maxon, Inc., 100 Nev. 479, 686 P.2d 235 (1984), *reh'g granted, modified,* 102 Nev. 52, 714 P.2d 1001 (1986); *Phillips,* 101 Nev. at 313, 704 P.2d at 1084; *Tahoe Village,* 95 Nev. at 135, 590 P.2d at 1162; *Caple,* 90 Nev. at 345, 526 P.2d at 337. No effort has ever been made to define the judicial conscience nor to describe how or under what circumstances it might be shocked.

The "conscience" rule differs from the "annihilation" rule and the "passion and prejudice" rule, next discussed, in that it relates directly to the magnitude of the award as related to the misconduct rather than to inferences to be drawn from external events (the financial effect upon the defendants or the supposed impermissible passion and prejudice indulged in by the jury). This is consistent with the views herein expressed; however, in this opinion we seek to formulate a more intelligible and less esoteric standard than one derived from a judicial manifestation of that indistinct little voice, the inward monitor of right and wrong known as conscience.

In *Schnitzer,* in addition to ruling the punitive award to be excessive because it was financially annihilating, the court concluded also that "the jury was to some extent, influenced by

passion and prejudice. . . ." *Schnitzer,* 78 Nev. at 311, 371 P.2d at 829-30. Although applied in compensatory damage cases (*see, e.g.,* Nevada Ind. Broadcasting v. Allen, 99 Nev. 404, 664 P.2d 337 (1983)), the passion rule has not been relied on in punitive damage cases other than in *Schnitzer.* The rule is criticized in *Schnitzer* itself, wherein it was stated that one "cannot avoid thinking" that the rule is "tailored to fit [the court's] feeling about the particular case before it. If that court does not approve the verdict it will state that the jury was motivated by passion or prejudice." *Schnitzer,* 78 Nev. at 310, 371 P.2d at 829. The rule, then, is meaningless. According to *Schnitzer,* the court, in following this rule, would first get a "feeling about the particular case," then arrive at a conclusion that the award is excessive, and then, rather mechanically, attribute the excessiveness to jury passion and prejudice. This does not appear to be a very satisfactory rule to follow. A defendant's being financially annihilated or the jury's being improperly influenced by passion and prejudice are certainly matters of concern to which the courts must be sensitive in reviewing punitive damages, but neither consideration provides, in itself, a satisfactory rule to be followed generally in judging the question of excessiveness.

Of late these rules of annihilation, conscience and passion have fallen into disuse. In our last decision on the point, Kellar v. Brown, 101 Nev. 273, 274, 701 P.2d 359, 360 (1985), $40,000.00 punitive damages was remitted to $7,500.00 on the ground that $7,500.00 was "the maximum amount that could be reasonably awarded under the circumstances." None of the above-discussed rules was mentioned; there was simply a recognition that at a certain point a punitive award becomes too much, unreasonable, disproportionate, *excessive* as a matter of law. A similar unencumbered ruling is found in our case of Midwest Supply, Inc. v. Waters, 89 Nev. 210, 213, 510 P.2d 876, 879 (1973), in which a punitive award was affirmed on the simple, but appropriate, ground that "under the circumstances of this case we do not find the jury's award of punitive damages excessive."

We see merit in *Kellar's* and *Midwest Supply's* focus on the magnitude of the award itself rather than on a more specific inquiry into how badly the defendant was injured financially or how passionate or prejudicial the jury or fact finder might have been in arriving at the punitive award. Although not spelled out in these cases, it is apparent that the determination of excessiveness is based on a more general judgment as to the relationship of necessary punishment and deterrence to the blameworthiness of the punishable conduct of the defendant.

What the court did in *Kellar* was to make a judgment, a moral judgment if you will, that $40,000.00 was too much punishment

for what Mr. Kellar did and that $7,500.00 was the most that could reasonably and legally be assessed. With this in mind it would appear timely for this court to elaborate a rule or standard based upon this process of judgment—the evaluation of excessiveness on the basis of the award's reasonable and proportional relationship to the guilt and culpability of the tortfeasor.

Unreasonableness and disproportionality between punishable conduct and the amount of the punitive award come forward as most viable concepts in establishing a workable standard for judging excessiveness of punitive damages. The Wyoming Supreme Court in its opinion in Cates v. Eddy, 669 P.2d 912 (Wyo. 1983), adopted a standard of "obvious disproportionality" in judging questions of punitive excessiveness. The Wyoming court, noting its faith in the jury system and an "extreme reluctance to modify jury verdicts," recognized still that "the jury is not free to award any sum it might choose, however large or small. . . ." Cates, 669 P.2d at 920. The Cates court went on to conclude that a punitive award must be judicially modified "[w]hen the verdict of the jury, at first blush, appears outrageous, grossly excessive, or to be the result of passion, prejudice, mistake, or improper motive, so as to be obviously disproportionate to the injury shown. . . ." Id. at 920-21 (emphasis added).

Although the Wyoming rule characterizes an excessive award in terms of being "outrageous" or "the result of passion, prejudice, mistake or improper motive," the gist of this rule is not the subjective estimation of the reviewing court's outrage or the mistake or prejudice of the awarding judge or jury. The real gist of the rule is the ultimate evaluation of the award itself as being clearly ("at first blush") too much ("grossly excessive"), or otherwise put, an evaluation as to whether the damage award inflicts more punishment than is deserved under the circumstances.

Based on the foregoing considerations, we declare the following standard for evaluating excessiveness of punitive damages: Punitive damages are legally excessive when the amount of damages awarded is clearly[2] disproportionate to the degree of blameworthiness and harmfulness inherent in the oppressive, fraudulent or malicious misconduct of the tortfeasor under the circumstances of a given case. If the awarding jury or judge assesses more in punitive damages than is reasonably necessary and fairly deserved in order to punish the offender and deter others from similar conduct, then the award must be set aside as excessive.

---

[2]We impose the clearly standard of review, as did Wyoming in the Cates case, out of deference to the factfinder's prerogative. "Findings of fact shall not be set aside unless clearly erroneous, . . ." NRCP 52(a) (emphasis

510

This rule makes it unnecessary for a reviewing court to make findings or judgments on basically factual questions of financial annihilation or the supposed passion or prejudice indulged in by the fact finder and permits the reviewing court to focus on a judicial determination of what is fair, just, and reasonable as opposed to being disproportionate and legally excessive. The concept of what is fair and just and reasonable is a sense that most of us possess from childhood. Whereas we cannot get into the minds and hearts of jurors in order to be able for example to get a "feeling about the particular case," *Schnitzer,* above, 78 Nev. at 310, 371 P.2d at 829, we can certainly make some kind of reliable moral judgment when it comes to unjust excessiveness of civil punishment and deterrence in the form of punitive and exemplary damages.

In arriving at the ultimate judgment of where excessiveness begins, courts can legitimately take into account any circumstances which relate to the limits of punishment and deterrence that can be properly imposed in a given case. Relevant circumstances include such matters as the financial position of the defendant, culpability and blameworthiness of the tortfeasor, vulnerability and injury suffered by the offended party, the extent to which the punished conduct offends the public's sense of justice and propriety, and the means which are judged necessary to deter future misconduct of this kind.[3]

As can be readily understood, these factors are largely common sense considerations which relate in everyday terms to the judgment of what goes beyond fair and proportionate punishment and reasonable deterrence under the circumstances. The ultimate question remains the same: Whether the fact finder has clearly exceeded the reasonable bounds of punishment due and justifiable deterrence as related to the acts complained of.

If we apply the stated rule to the case before us, we readily conclude that the punitive awards in the case at bar are clearly excessive.

---

added). Case law has long recognized the need for caution in setting aside tort damages in such cases. In 1763, the Lord Chief Justice of England expressed the idea this way in Huckle v. Money, 95 Eng. Rep. 768, 2 Wils. K.B. 205 (1763):

> [I]t is very dangerous for the judges to intermeddle in damages for torts; it must be a glaring case indeed of outrageous damages in a tort, and which all mankind *at first blush* must think so, to induce a court to grant a new trial for excessive damages.

(Emphasis added.)

[3]*See* Comment, *Punitive Damages: An Appeal for Deterrence,* 61 Neb. L. Rev. 651 (1982).

The degree of fault or blame is not extravagant. This was a simple business sales transaction in which the plaintiffs accused the defendants of misrepresentation and fraud. Although the record supports liability for fraud and consequent punitive damages, the conduct of defendants can probably be said to be toward the lower end of the spectrum of malevolence found in punitive damage cases.

The record shows that the Kahns may have suffered considerable inconvenience and annoyance as a result of appellants' fraud, but again this is not high on the scale of severity of harm done when compared to the general run of malicious and oppressive acts which make up the bulk of punitive damage cases. In any event, the business is still in operation and appears to have survived the defendants' misdeeds. The Kahns are not seen to be highly "vulnerable" victims in this case. From our view of the record the Kahns appear to be business people of normal and expected wisdom and sophistication in making this transaction.

On the question of the tortfeasors' financial position, we compute that the punitive award (excluding a reduction of assets by the $391,049.00 compensatory award) against Berman is approximately thirty percent of his net worth and against Pecson is about forty-two percent of his net worth. Each award appears to be depleting the defendants' assets in an amount and in a proportion far in excess of that which can be said reasonably necessary to punish either defendant or to deter others from similar fraudulent conduct.

The compensatory award, quite large under the circumstances, reduces the estate of each defendant substantially. If Berman and Pecson each had to pay half of the $391,049.00 compensatory award, then the punitive award against Berman would be calculated at forty-three percent of his assets, and the punitive award against Pecson would be calculated at seventy percent of his assets. These are indeed excessively and disproportionately punitive under the circumstances. We hold the awards to be clearly excessive and disproportionate as a matter of law.

### Modification and Reduction of Award of Punitive Damages and Disallowance of Attorney's Fees

Under the specific circumstances of this case we see the award as being disproportionate and have concluded that neither individual deserved punishment nor deterrence which would justify the amounts awarded. As noted, this is particularly true in view of the fact that their proven net assets of $1,626,000.00 and $705,700.00 will be substantially reduced by payment of compensatory damages to the plaintiffs. Subjective as it may necessarily be, we set as the upper limit of just deserts, proportionate

punishment, and justifiable deterrence the sum of $250,000.00 punitive damages in the case of Berman and the sum of $150,000.00 in the case of Pecson. We judge these awards to be the "maximum amount that could be reasonably awarded under the circumstances." *Kellar,* 101 Nev. at 274, 701 P.2d at 360.

As to compensatory damages, the judgment of the trial court is affirmed. As to punitive damages, the award against Berman is reduced to $250,000.00, and the award against Pecson is reduced to $150,000.00. Attorney's fees awarded to the Kahns are disallowed.[4] Other claims of error have been considered and found to be without merit.

GUNDERSON, C. J., and STEFFEN, YOUNG, and MOWBRAY, JJ., concur.

---

[4]This court has consistently held that absent a rule, statute or contract which authorizes an award of attorney's fees, such fees may not be allowed. Lubritz v. Circus Circus Hotels, Inc., 101 Nev. 109, 693 P.2d 1261 (1985). There is no contractual basis for the award of attorney's fees. Likewise, the facts of this case do not fall within any other rule or statute which would justify an award of attorney's fees. We conclude, therefore, that the award of attorney's fees to the Kahns was error and must be stricken from the judgment. *See* NRS 18.010.