NEVADA INSURANCE GUARANTY ASSOCIATION, APPELLANT, *v.* SIERRA AUTO CENTER, RESPONDENT.

No. 22882

December 23, 1992 844 P.2d 126

*White, Guinan & Kahan,* Reno, for Appellant.

*Lionel Sawyer & Collins* and *Pat Lundvall,* Reno, for Respondent.

## OPINION

*Per Curiam:*

### THE FACTS

On March 16, 1985, an employee of respondent Sierra Auto Center ("Sierra"), while driving a Sierra-owned automobile, struck and killed a pedestrian, Douglas J. Fellom ("Fellom"). Fellom's heir filed suit against Sierra and the employee.

Mission Insurance Company ("Mission") insured Sierra. Mission defended Sierra and the employee in the action. On February 24, 1987, Mission was declared insolvent. Mission's insolvency triggered the Nevada Insurance Guaranty Association Act ("the Act"). Under the Act, appellant Nevada Insurance Guaranty Association ("NIGA"), a non-profit statutorily-created association of Nevada insurers, assumed the obligations of Sierra's insurance policy.

NIGA assumed Sierra's defense in the Fellom action. How-

ever, NIGA discovered that Fellom possessed an uninsured motorist ("UM") insurance policy with the California State Automobile Association ("CSAA"). NIGA believed that Mission's insolvency triggered the coverage provisions of Fellom's UM policy. In turn, pursuant to its interpretation of NRS 687A.100(1), NIGA refused to continue in Sierra's defense until Fellom's heir fully exhausted the coverage of the CSAA UM policy. NRS 687A.100 provides, in pertinent part:

Exhaustion of remedies of insured.

1. Any person having a claim against his insurer, under any provision in his insurance policy, which is also a covered claim shall be required to exhaust first his right under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of the recovery under the claimant's insurance policy.

After NIGA refused its obligation on the Fellom claim and before trial in the Fellom litigation, Sierra settled with Fellom's heir.

On November 29, 1989, Sierra filed this tort and contract action against NIGA. Sierra alleged that it personally paid $50,000 to settle the Fellom claim. Sierra argued that NIGA tortiously refused to pay "in the shoes of" Sierra's insolvent insurer Mission. Sierra prayed for reimbursement of the $50,000 plus attorney fees. NIGA asserted an affirmative defense that NRS 687A.100(1) precluded it from paying on the Fellom claim.

After a bench trial, the district court rendered judgment for Sierra, finding that NIGA relied on an erroneous interpretation of NRS 687A.100(1) in order to disclaim its obligation on the Fellom claim. The district court also found that Mission's insolvency did not trigger the coverage of CSAA's UM policy, and thus, NRS 687A.100(1) did not condition NIGA's duty to Sierra on the exhaustion of Fellom's UM policy. In turn, the district court ordered NIGA to reimburse Sierra the $50,000 Fellom settlement. The district court also ruled that NIGA's interpretation of NRS 687A.100(1) constituted bad faith, justifying an award of attorney fees as consequential damages. This appeal ensued.

On appeal, NIGA argues that the district court's judgment constituted error.

## DISCUSSION

### Mission's Insolvency

We hold that NRS 687A.100(1) does not apply to this case, and hence NIGA improperly invoked the statute in order to disclaim

liability on the Fellom claim. We base our conclusion on the district court's findings regarding Mission's insolvency.

The district court made sound factual findings on this issue. The district court properly found that the CSAA UM policy became effective only if the other driver's insurer became insolvent within *one year* after the accident. However, the court also found that Mission was judicially declared insolvent more than *two years after* the accident. In turn, the district court ruled that Mission's insolvency more than a year after the accident should never have triggered the coverage provisions of Fellom's UM policy. Thus, the court concluded that NRS 687A.100(1) did not apply to the Fellom litigation because neither Sierra nor Fellom's heir possessed an insurance policy to exhaust pursuant to NRS 687A.100(1). Therefore, the court refused to relieve NIGA of its obligation on the Fellom claim.

Substantial evidence in the record supports the district court's findings on this issue. Indeed we will not disturb a trial court's findings of fact unless they are clearly erroneous and not based on substantial evidence. Beverly Enterprises v. Globe Land Corp., 90 Nev. 363, 365, 526 P.2d 1179, 1180 (1974).

Thus, we affirm the district court's ruling on this issue. Mission's insolvency should not have activated Fellom's UM policy provisions because Mission was not "insolvent" within the meaning of the UM policy. Thus, irrespective of the interpretation of NRS 687A.100(1), that statute did not apply to the case. Therefore, NIGA improperly denied its obligations on behalf of Sierra.

*Bad Faith*

The district court determined that NIGA's interpretation of NRS 687A.100(1) constituted bad faith and, thus, awarded Sierra consequential damages in the form of attorney fees.

The district court found that NIGA's bad faith emanated in two forms. First, the district court reasoned that NIGA inherited Mission's implied covenant of good faith and fair dealing. The court concluded that NIGA breached this covenant when it failed to settle the Fellom claim on Sierra's behalf. Second, the district court ruled that NIGA acted in bad faith in a manner impliedly prohibited by NRS 687A.150 because NIGA's interpretation of NRS 687A.100(1) was "unreasonable."[1] We disagree.

---

[1]NRS 687A.150 provides, in part: "There is no liability, and no cause of action of any nature shall arise against . . . the association . . . for any

We hold that NIGA did not owe Sierra a duty of good faith and fair dealing.

In Isaacson v. California Ins. Guar. Ass'n, 750 P.2d 297 (Cal. 1988), the California Supreme Court noted that the implied covenant of good faith and fair dealing cannot arise out of the statutorily-created relationship between the guaranty association and the insured. *Id.* at 306. The *Isaacson* court held that the guaranty association and the insurer lacked privity of contract, and thus the insured's common law bad faith claim failed. *Id.*

*Isaacson* persuades us. The implied covenant of good faith and fair dealing can only arise out of a contractual relationship. However, NIGA's relationship with Sierra is purely statutory. Indeed, regardless of the terms of the insurance agreement between Sierra and Mission, NIGA's relationship with Sierra is primarily governed by the Act. For example, even though Sierra's policy with Mission provided Sierra with $500,000 of insurance coverage, NRS 687A.060 limits NIGA's liability on that same policy to $300,000. Thus, the Act will control over any contrary provisions of the policy.

Therefore, we conclude that NIGA did not act in bad faith because it did not owe Sierra a duty of good faith and fair dealing.

Additionally, NIGA's interpretation of NRS 687A.100(1) was not unreasonable pursuant to NRS 687A.150. Indeed, in the context of bad faith allegations, attorney fees are inappropriate when the contested issue involves a question of first impression. Am. Excess Ins. Co. v. MGM, 102 Nev. 601, 606, 729 P.2d 1352, 1355 (1986). Indisputably, this case presents complex statutory issues of first impression. Therefore, we reverse the district court's grant of bad faith damages to Sierra.

We have carefully considered the other issues raised and conclude that they lack merit or need not be addressed given our disposition of this appeal. Accordingly, we affirm the district court's order granting Sierra reimbursement for the Fellom settlement, and we reverse the district court's order granting Sierra bad faith consequential damages and attorney fees.[2]

---

*reasonable* action taken by them in the performance of their duties and powers under this chapter." (Emphasis added.) Pursuant to this statute, NIGA may lose its statutory immunity and, thus, incur bad faith liability for "unreasonable" actions.

[2]THE HONORABLE JOHN C. MOWBRAY, Chief Justice, did not participate in the decision of this matter.