GUARANTY NATIONAL INSURANCE COMPANY, Appellant, *v.* GERALD E. POTTER and VALERIE H. POTTER, Respondents.

No. 26373

February 29, 1996                    912 P.2d 267

[Rehearing denied June 13, 1996]

*Perry & Spann,* Reno; *Ropers, Majeski, Kohn, Bentley, Wagner and Kane, Michael J. Brady* and *Kelly C. Franks,* Redwood City, California, for Appellant.

*Robert H. Perry,* Reno, for Respondents.

## OPINION

By the Court, STEFFEN, C. J.:

The district court awarded Respondents Gerald and Valerie Potter $75,000 each in compensatory damages and $1,000,000 in punitive damages because of the manner in which appellant Guaranty National Insurance Company ("GNIC") treated the Potters in connection with the payment for services involving independent medical examinations ("IMEs"). Under the insurance policy, the Potters were obligated to submit to an IME and GNIC was obligated to pay for the IME.

On appeal, GNIC argues that (1) a denial or delay in payment of a valid claim is an essential element for the tort of bad faith; (2) the finding of bad faith was not supported by substantial evidence; (3) the compensatory damage awards were excessive; and (4) punitive damages were unwarranted, or alternatively, the

amount awarded was excessive. We conclude that GNIC was contractually obligated to pay for the IME and that under the facts of this case, its delay in paying for the exams constituted an act of bad faith. Although we affirm the compensatory damage awards, we conclude that the punitive damages award entered against GNIC was excessive as a matter of law.

## FACTS

On May 27, 1990, a speeding car collided with a mobile home belonging to the Potters, injuring both Valerie and Gerald Potter. The Potters hired an attorney, Linda Galli, to represent their interests against the tortfeasor's insurer, Allstate, and in connection with their own insurer, GNIC. In May 1991, the Potters settled with Allstate for the policy limits of $15,000 each.

The Potters' insurance policy with GNIC provided underinsured motorist ("UIM") coverage. In May 1991, the Potters submitted a claim for UIM benefits under that policy. The claim was handled by Doris Patow, GNIC's Reno Claims Manager.

Patow questioned whether certain bills submitted with the Potters' claim were excessive. In February 1992, Patow sent a letter to Galli requesting that the Potters submit to independent medical exams. The letter stated: "Failure to attend this appointment could jeopardize your clients' coverage."[1]

Patow contacted Dr. Charles Quaglieri of Reno Neurological Associates ("RNA"), scheduled appointments for the Potters' IMEs, prepaid $900 for the two exams, and indicated that pre-authorization was required before EMGs or MRIs could be scheduled.

On March 9, 1992, Dr. Quaglieri examined the Potters. He performed EMGs and nerve conduction studies on both of the Potters. GNIC paid for these exams on March 31, 1992. Dr. Quaglieri also performed three somatosensory evoked response tests on Mrs. Potter, which GNIC paid for in December 1992. On March 9, Dr. Quaglieri also prepared preliminary reports for GNIC. The report on Mr. Potter stated: "In order to rule out any other more significant injuries he will need an MRI scan of the affected areas." The report on Mrs. Potter did not specifically mention any additional tests, but Dr. Quaglieri did state: "I will

---

[1]The Potters' insurance policy contained the following provision:

A person claiming any coverage under this policy must also:

. . . .

(3) Submit to physical examinations at *our* expense by doctors *we* select as often as *we* may reasonably require.

. . . .

evaluate her for any other possible explanations for her symptoms especially in light of the numbness of the left upper extremity."

Two employees for RNA testified that they contacted Patow and obtained authorization for x-rays and MRIs. They filled out Patient Authorization Forms which indicated the tests that were authorized, who provided the authorization, and the date thereof.

Patow testified that she could not remember these phone calls or whether she authorized each test. She further testified that when Steve Carlson, the claims manager who took over the Potters' claim after Patow left the Reno office, called her about the authorization for the Potters' tests, she told Carlson that she could not recall specifically what tests she had authorized. She did tell Carlson that at the time of her authorization, she contemplated that the tests would cost approximately $6,000. Patow further testified that it was within Dr. Quaglieri's scope of authority to order exams that he deemed reasonably necessary, and that she relied on his expertise in deciding whether to authorize examinations.

On March 24, 1992, Dr. Quaglieri sent the Potters to Northern Nevada Radiology and Northern Nevada MRI (collectively "NNR"). NNR performed two x-rays and two MRIs on Mrs. Potter and three x-rays and three MRIs on Mr. Potter. These exams totaled $6,553. NNR required the Potters to fill out and sign responsibility forms. Although the Potters provided their insurance information, the responsibility forms warned: "Please be aware that as with every medical office the patient is responsible for any medical fees incurred." GNIC did not become aware of these forms until they were disclosed during the NRCP 16.1 conference in July 1993.

Patow left GNIC on April 3, 1992, and the Potters' file was transferred to Steve Carlson. Carlson first reviewed the file on April 17, 1992. Dr. Quaglieri's final reports arrived in April, and Carlson determined that the IME supported the Potters' claim. In May 1992, GNIC paid the UIM policy limits of $15,000 each to the Potters.

Early in May 1992, Carlson also received statements from NNR totalling $6,553. He was shocked by the number and costs of the exams. Carlson reviewed the file and Patow's notes which he believed indicated that only one additional test had been authorized. On May 5, 1992, Carlson contacted Patow, who could not remember what tests she had authorized. Because of the confusion, Carlson submitted the statement to Intracorp, an independent medical records review company, to evaluate whether the testing was reasonable and necessary. Intracorp recommended denying two MRIs and two x-rays for Mr. Potter, and one MRI, all x-rays, and the somatosensory evoked response studies for

Mrs. Potter. According to the Intracorp report, based on customary charges, GNIC should only pay $2,133 for the tests that were reasonable and necessary.

On April 29, 1992, the Potters received statements from NNR, totalling $6,553. They contacted their attorney, who believed it was just a clerical error—that the Potters had been sent duplicates. On approximately June 30, 1992, the Potters received collection notices from Collection Service of Nevada ("CSN"), on behalf of NNR. The notices explained that the Potters had 15 days to pay or contact NNR; otherwise, the account would be referred to CSN for collection.

On July 16, Mr. Potter took some of the notices to Galli's office with a note stating that they were still receiving bills. On July 20, attorney Galli wrote a letter to Carlson confirming a conversation they had on the same day, and attaching copies of bills from RNA, NNR and CSN. The letter indicated:

> You stated in our conversation that Guaranty National did agree to pay for the I.M.E. and that you were negotiating a reasonable settlement of these bills with the providers. I hope you are able to quickly resolve this problem, as the Potter's [sic] are understandably upset about being harassed by these creditors and the Collection Service.

Carlson testified that he was surprised to learn that the Potters were being billed. When Carlson realized that the 15 day deadline on the June 30 notice had already passed, he contacted Galli and was told that she had already notified the providers about the billing error. Carlson did nothing else to protect the Potters because he believed it was a clerical error and that Galli's phone call probably had solved the problem.

The Potters continued receiving bills. On September 9, 1992, Galli wrote to Carlson explaining that her clients were receiving "demand statements" from CSN and that their credit was being adversely affected. Galli demanded an explanation for GNIC's failure to pay the bills and requested a response within two weeks. After receiving this letter, Carlson thought he had some time and that there was no pressure to make an immediate phone call. According to Galli, after the September 9 letter, Carlson continued to assure her that he was actively negotiating with the creditors.

On October 6, 1992, CSN sent the Potters four formal demands for payment. On October 17, 1992, CSN sent a notice to the Potters demanding payment by November 5 or else they would be reported to three credit agencies. According to these notices, "[a] bad mark like this could stay on your file for seven years." Carlson was not provided with copies of these notices.

On October 20, 1992, Galli again contacted Carlson. Carlson informed her that he had contacted Rose Dorris at CSN and explained the situation. He further indicated that he was getting everything resolved and should have an agreement on a compromise amount by October 21. Carlson's notes for October 21 indicate that he offered CSN $2,333 to settle the account. Although Galli believed that Carlson had been working to settle the bills since July, Carlson testified that October 20 was the first time he had contacted the creditors.

On October 21, 1992, Galli tried to contact Dorris at CSN to verify that the account had been settled. Dorris returned the call on October 27, and explained that GNIC's $2,000 offer was unacceptable, and that the Potters would be sued. Galli testified that she contacted Carlson about the situation. Carlson's notes for October 28 indicate that he spoke with Dorris, that GNIC's settlement offer was too low and CSN would likely sue.

On November 3, 1992, CSN sent the Potters a notice threatening to sue them if payment was not received by November 5, 1992. Galli testified that she did not provide Carlson with a copy of this notice.

On November 17, 1992, Carlson wrote a letter to CSN explaining "that any collection effort against Mr. and Mrs. Potter directly is misdirected as they were simply the insureds who voluntarily cooperated with the Independent Medical Examination process." In the letter, Carlson made a compromise offer and enclosed checks for $3,043. Carlson sent a copy of the letter to Galli. After sending the November 17 letter and checks, Carlson did not contact CSN or any of the creditors to determine whether the settlement had been accepted. In early January 1993, Galli's secretary called Carlson and was told that to the best of his knowledge everything was settled.

On March 8, 1993, the Potters were served with a Summons and Complaint. CSN had filed suit to collect $6,553, plus interest, costs and attorney's fees. On April 27, 1993, the Potters filed a third-party complaint against GNIC for breach of contract, tortious breach of the covenant of good faith and fair dealing, and fraud.

On May 18, 1993, Carlson sent a letter to Dr. Quaglieri renewing the offer he had made to CSN on November 17, 1992. Carlson stated that unless Dr. Quaglieri could persuade CSN to accept the offer and to obtain a voluntary dismissal of the Potters' complaint against GNIC, GNIC would sue him for "the excessive charges incurred and inappropriately billed to Mr. and Mrs. Potter."[2]

---

[2]Carlson testified that his strategy was to get the Potters dismissed from the suit while pursuing GNIC's dispute with Dr. Quaglieri and NNR.

On May 24, 1993, RNA faxed the Potters' patient authorization forms to GNIC. Carlson was not satisfied that separate authorization had been given for each and every test. However, on May 26, 1993, Carlson called Bonnie Serpa, the office manager at RNA, and offered to pay $5,043, if CSN would dismiss its suit against the Potters and the Potters would dismiss their suit against GNIC. Carlson also indicated that the Potters' credit rating must be restored in conjunction with the settlement. GNIC made three additional offers between October 1993 and late February 1994. As a condition to each of these offers, GNIC required that the Potters' credit rating be restored.

A bench trial was set for March 7, 1994. On that day GNIC tendered a check for $12,508.54 to the Potters, who then endorsed the check to CSN. As part of a stipulation, the Potters dismissed their counterclaim against CSN and CSN dismissed its claims against the Potters and agreed to ''do everything within its power to request the various credit reporting agencies . . . to remove all information regarding these five (5) collection accounts from their records.''

The Potters claims against GNIC proceeded to a bench trial from March 7 to March 11, 1994.

After the close of evidence, the district court concluded that the Potters had met their burden of proof on their tort claim of bad faith, and that punitive damages were warranted. On April 5, 1994, the district court entered judgment against GNIC, awarding the Potters $150,000 in compensatory damages and $1,000,000 in punitive damages.

On April 18, 1994, GNIC filed a motion for judgment notwithstanding the verdict, a new trial, and to amend the findings of fact and conclusions of law. The district court denied the motion in toto and awarded attorney's fees and costs in the amount of $36,000. GNIC timely appealed.[3]

## DISCUSSION

### Bad faith

GNIC contends that a tort action against an insurer for breach of the implied covenant of good faith and fair dealing is limited to the unreasonable denial or delay in payment of a valid claim. Accordingly, because GNIC paid the full policy limits under the Potters' UIM coverage, GNIC insists that it could not have

---

[3]The notice of appeal indicates that GNIC is appealing the award of attorney's fees and costs; however, GNIC failed to address this issue in its briefs and argument on appeal. We therefore consider the issue abandoned and will not address it in this opinion.

breached the implied covenant of good faith and fair dealing. We disagree.

Generally, this court has addressed an insurer's breach of the implied covenant of good faith and fair dealing as the unreasonable denial or delay in payment of a valid claim. *See, e.g.,* Pemberton v. Farmers Ins. Exch., 109 Nev. 789, 793, 858 P.2d 380, 382 (1993); Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 888, 891 (1991). This, however, does not mean that the tort of bad faith is limited to such cases.

Here, GNIC required the Potters to submit to an IME. The insurance policy provides an express promise by the insurer to pay for such examinations. GNIC had an express obligation to pay for the IME and an implied obligation to deal fairly with the Potters in paying for IMEs required by the insurer because the contract involves a special relationship between an insured and insurer, with the parties in unequal bargaining positions. *See* Ainsworth v. Combined Ins. Co., 104 Nev. 587, 592, 763 P.2d 673, 676 (1988), *cert. denied,* 493 U.S. 958 (1989).

Next, GNIC contends that there was insufficient evidence to support the district court's finding that GNIC acted in bad faith. We disagree. This court "will not disturb a trial court's findings of fact unless they are clearly erroneous and not based on substantial evidence." Nevada Ins. Guar. Ass'n v. Sierra Auto Ctr., 108 Nev. 1123, 1126, 844 P.2d 126, 128 (1992). Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct. *See* American Excess Ins. Co. v. MGM Grand Hotels, Inc., 102 Nev. 601, 605, 729 P.2d 1352, 1354-55 (1986). After reviewing the record, we conclude that there was sufficient evidence of bad faith to support the district court's judgment.

*Compensatory damage awards*

GNIC contends that the award of $150,000 in compensatory damages is excessive and not supported by the evidence because the Potters suffered no economic injury and their credit has been restored. We again disagree.

Generally, this court will affirm an award of compensatory damages unless the award is so excessive that it appears to have been "given under the influence of passion or prejudice." NRCP 59(a)(6);[4] Miller v. Schnitzer, 78 Nev. 301, 308, 371 P.2d 824,

---

[4]NRCP 59(a) provides, in relevant part:

A new trial may be granted to all or any of the parties and on all or part

828 (1962), *abrogated in part on other grounds by* Ace Truck & Equip. Rental v. Kahn, 103 Nev. 503, 746 P.2d 132 (1987). The size of the award alone is not conclusive evidence that it was the result of passion or prejudice. *Miller,* 78 Nev. at 309, 371 P.2d at 828. Rather, "[t]he core of the matter seems to be that an appellate court will disallow or reduce the award if its judicial conscience is shocked." *Id.* at 309, 371 P.2d at 829.

There is nothing in the record to indicate that the trial judge was acting under the influence of passion or prejudice when it awarded compensatory damages of $75,000 to each of the Potters. The award is consistent with the two years of threats and subsequent litigation the Potters had to endure and the damage to their credit reputation during that time. The Potters testified about the anxiety and concerns caused by the threats and litigation, including having to travel to Nevada[5] and hire an attorney. Moreover, the fact that the trial judge refused to award future damages indicates that the trial judge was not influenced by passion or prejudice; otherwise, the trial judge could have used such an award to further compensate the Potters. Therefore, we conclude that the award of $150,000 compensatory damages was not excessive.[6]

*Punitive damage award*

GNIC contends that there is no evidence that it acted with malice or oppression, and thus the district court erred in awarding punitive damages.

NRS 42.005 provides that punitive damages may be awarded "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that

---

of the issues for any of the following causes or grounds materially affecting the substantial rights of an aggrieved party: . . . (6) Excessive damages appearing to have been given under the influence of passion or prejudice . . . .

[5]The Potters had moved to Southern California.

[6]We note that the facts of this case represent another exaggerated example of the lengths to which some insurers will go to save comparatively small sums of money at the expense of their insureds. Here the insurer required its insureds to undergo the time and inconvenience of IMEs and to thereafter endure extended threats and harassment over the insurer's unwillingness to promptly extricate its insureds from a position of liability during protracted haggling over the sum of about $4,000 relating to the IMEs. There is little wonder that the bad faith tort evolved as a method of dealing with such callous disregard for the feelings and predicaments of insured customers.

the defendant has been guilty of oppression, fraud or malice, express or implied." This court will not disturb an award of punitive damages unless "the record lacks substantial evidence to support the required finding of 'oppression, fraud or malice, express or implied.'" First Interstate Bank v. Jafbros Auto Body, Inc., 106 Nev. 54, 56, 787 P.2d 765, 767 (1990) (quoting Village Dev. Co. v. Filice, 90 Nev. 305, 315, 526 P.2d 83, 89 (1974)).

This court has defined "oppression" as "'a conscious disregard for the rights of others which constitutes an act of subjecting plaintiffs to cruel and unjust hardship.'" United Fire Ins. Co. v. McClelland, 105 Nev. 504, 512-13, 780 P.2d 193, 198 (1989) (quoting Ainsworth v. Combined Ins. Co., 104 Nev. 587, 590, 763 P.2d 673, 675 (1988), cert. denied, 493 U.S. 958 (1989)).

In the case at bar, the district court found "that the conduct of G.N.I.C. was wilful, intentional and done in reckless disregard of the consequences to the Potters and with a conscious disregard for the rights of the Potters thereby subjecting them to cruel and unjust hardships." We conclude that there was sufficient evidence to support this finding.

However, we conclude that the punitive damages awarded against GNIC were excessive as a matter of law. In Ace Truck & Equipment Rentals, Inc. v. Kahn, 103 Nev. 503, 509, 746 P.2d 132, 136-37 (1987), this court set forth the following standard for reviewing the excessiveness of a punitive damages award:

> Punitive damages are legally excessive when the amount of damages awarded is *clearly* disproportionate to the degree of blameworthiness and harmfulness inherent in the oppressive, fraudulent or malicious misconduct of the tortfeasor under the circumstances of a given case. If the awarding jury or judge assesses more in punitive damages than is reasonably necessary and fairly deserved in order to punish the offender and deter others from similar conduct, then the award must be set aside as excessive.

(Footnote omitted). We also set out a non-exhaustive list of circumstances that are relevant in applying the standard, including "the financial position of the defendant, culpability and blameworthiness of the tortfeasor, vulnerability and injury suffered by the offended party, the extent to which the punished conduct offends the public's sense of justice and propriety, and the means which are judged necessary to deter future misconduct of this kind." Id. at 510, 746 P.2d at 137.

Based on the standards established in *Ace Truck* and after considering all of the factors enumerated therein, we conclude that in this case an award of $1,000,000 in punitive damages would be unreasonable and disproportionate to the behavior of

GNIC. Although the award amounts to only one percent of GNIC's net worth ($104,000,000), the amount was excessive in light of GNIC's overall conduct. GNIC paid the full policy limits in May 1992, prepaid the initial IME examinations, and paid part of the diagnostic examinations before any dispute arose. Moreover, GNIC repeatedly attempted to settle the dispute by contacting both RNA and CSN, always representing the debt as its responsibility, not the Potters'. Cf. Kellar v. Brown, 101 Nev. 273, 274, 701 P.2d 359, 359 (1985) (punitive damages reduced because defendant attempted to settle the dispute). Finally, the amount awarded constituted excessive punishment, especially where the evidence failed to reveal that the conduct involved represented a pattern of behavior on the part of GNIC in the payment of costs related to IMEs required of its insureds. Additionally, Carlson testified that in his twenty-five years of experience he had never encountered a similar situation. Therefore, we conclude that $1,000,000 was excessive.

We affirm the judgment of the trial court in all respects except for the award of punitive damages. The judgment for punitive damages is reduced from $1,000,000 to $250,000.[7]

YOUNG and SHEARING, JJ., concur.

ROSE, J., with whom SPRINGER, J., joins, concurring:

I concur in the affirmance of this case but would approve the entire award of punitive damages rather than modify it.

---

[7]Our resolution of this matter obviates the need to address GNIC's arguments regarding the applicability of the punitive damages cap under NRS 42.005.