IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ZAKI WAGNER, *Plaintiff/Appellant/Cross-Appellee,*

*v.*

ARIZONA MUNICIPAL RISK RETENTION POOL, et al.,
*Defendants/Appellees/Cross-Appellants.*

No. 1 CA-CV 24-0562

FILED 01-07-2026

Appeal from the Superior Court in Maricopa County
No. CV2022-013732
The Honorable John L. Blanchard, Judge

**REVERSED IN PART; VACATED AND REMANDED IN PART;
AFFIRMED IN PART**

COUNSEL

Robert J. Hommel, P.C., Phoenix
By Robert J. Hommel
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee*

Robbins Curtin Millea & Showalter, LLC, Phoenix
By Matthew P. Millea
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee*

DePasquale Law Firm, P.C., Phoenix
By Mark J. DePasquale
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee*

Broening Oberg Woods & Wilson P.C., Phoenix
By Robert T. Sullivan, Kelley M. Jancaitis, Jessica J. Kokal
*Counsel for Defendants/Appellees/Cross-Appellants*

—————————————

## OPINION

Judge Brian Y. Furuya delivered the opinion of the Court, in which Presiding Judge Angela K. Paton and Judge Daniel J. Kiley joined. Judge Furuya also delivered a separate special concurrence.

—————————————

**F U R U Y A**, Judge:

¶1        Appellant Zaki Wagner challenges the superior court's summary judgment and fee award in favor of appellees Arizona Municipal Risk Retention Pool (the "Risk Pool") and Berkley Risk Administrators Company LLC ("Berkley"). Appellees cross-appeal the superior court's decision that the Risk Pool is not a public entity for the purposes of the notice of claim statute. For the following reasons, we reverse in part and affirm in part.

## FACTS AND PROCEDURAL HISTORY

¶2        The Risk Pool is an Arizona insurer comprised of cities and towns joining to provide liability coverage, including workers' compensation insurance, for its members, including the city of Maricopa. After being injured in the course and scope of his employment as a City of Maricopa police officer in July 2018, Wagner filed a workers' compensation claim with the Risk Pool. Berkley acted as the third-party administrator for Wagner's claim. Berkley initially accepted the claim and provided benefits. However, across the ensuing three years of treatment, Berkley repeatedly denied and then allowed, closed and then reinstated, Wagner's coverage and benefits.

¶3        Wagner filed a lawsuit in the superior court alleging bad faith in October 2022. The parties filed cross-motions for summary judgment. The court granted Berkley's motion for summary judgment on the basis that Wagner's claim was time-barred by the statute of limitations. Wagner timely appealed and the Risk Pool timely cross-appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") Section 12-2101(A)(1).

## DISCUSSION

¶4        The Risk Pool challenges the court's finding that it is not a public entity. Wagner challenges the court's dismissal of Berkley from the case and its award of attorneys' fees. We review each argument in turn.

I.   **The Risk Pool is a Public Entity for Purposes of A.R.S. Section 12-821.01.**

¶5          Any person asserting a cause of action against a public entity is required to file a notice of claim within 180 days after the claim accrues. A.R.S. § 12-821.01(A). "Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred . . . ." *Id.* The notice of claim statute's purpose is to prevent the government from incurring "excess or unwarranted liability and [to] facilitate[] settlement of claims by allowing the government to investigate the claim . . . and budget for settlement or payment of large claims." *Yollin v. City of Glendale*, 219 Ariz. 24, 29 ¶ 11 (App. 2008). Also, "[a]ll actions against any public entity . . . shall be brought within one year after the cause of action accrues and not afterward." A.R.S. § 12-821. Thus, the notice of claim statute and its associated statute of limitations period apply to the Risk Pool if it is a public entity.

¶6          The parties dispute whether the Risk Pool is a "public entity" under A.R.S. Section 12-821.01(A). The Risk Pool contends that it is a public entity; Wagner argues that it is not. Because this issue is dispositive as to Wagner's claims against the Risk Pool, we address it first.

¶7          We review the question of whether the Risk Pool is a public entity for the purposes of A.R.S. Section 12-821.01(A) de novo. *State v. Serrato*, ___ Ariz. ___, ___, 568 P.3d 756, 759 ¶ 9 (2025) (reviewing an issue requiring statutory interpretation de novo) (citing *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 13 (2024)). When interpreting statutes, we begin with the text. *Id.* (citing *Franklin v. CSAA Gen. Ins. Co.*, 255 Ariz. 409, 411 ¶ 8 (2023)). "We interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Id.* (quoting *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019)). If the statute's text is unambiguous, "it controls unless it results in an absurdity or a constitutional violation." *Id.* (citing *4QTKIDZ, LLC v. HNT Holdings, LLC*, 253 Ariz. 382, 385 ¶ 5 (2022)).

¶8          The applicable statutory definition provides that "'[p]ublic entity' includes this state and any political subdivision of this state." A.R.S. § 12-820(7). Though we agree with Wagner that the Risk Pool does not qualify as either the "state" or as a "political subdivision of this state," that is not determinative of the Risk Pool's status. The statutory definition of "public entity" for purposes of compliance with A.R.S. Section 12-821.01 states that this term "*includes* this state and any political subdivision of this state." *Id.* (emphasis added). As our supreme court recently reiterated, "the

term 'includes' is a 'term of enlargement, . . . encompass[ing] items that were not specifically enumerated.'" *Sanchez v. Maricopa Cnty.*, ___ Ariz. ___, ___, 572 P.3d 101, 110 ¶ 29 (2025) (quoting *Tracy v. Superior Court of Maricopa Cnty.*, 168 Ariz. 23, 35 (1991)). In *Sanchez*, our supreme court held that a county sheriff falls within the definition of a "public entity" under A.R.S. Section 12-820 despite being neither the "state" nor a "political subdivision." *Id.* at 111 ¶ 32. In accepting that "§ 12-820(7) does not necessarily preclude a county sheriff from constituting a public entity[,]" *id.* at 110 ¶ 29, the *Sanchez* court rejected more restrictive readings of that definition, such as that advanced by Wagner in response to the Risk Pool's motion. We similarly reject that narrow reading of the definition. Instead, "when the legislature does not define a term, but states that the term 'includes' specified items, we construe the term to also include other items that fall within the term's ordinary meaning." *State ex rel. Dep't of Econ. Sec. v. Torres*, 245 Ariz. 554, 558 ¶ 14 (App. 2018). Thus, we must assess whether the Risk Pool otherwise qualifies for inclusion within the ordinary meaning of "public entity." Our decision in *Pivotal Colorado II, L.L.C. v. Arizona Public Safety Personnel Retirement System*, 234 Ariz. 369 (App. 2014), is instructive to that end.

¶9 In *Pivotal Colorado II*, we addressed whether the Arizona Public Safety Personnel Retirement System ("PSPRS") was a "public entity" subject to the notice of claim and limitations statutes. To determine whether PSPRS qualified as a "public entity," we considered the following factors: (1) whether the entity is a creature of statute; (2) whether its governing board is appointed by a political subdivision; and (3) whether the entity "is subject to various levels of state control while being expressly exempted from other controls, yet not exempted from the immunity provisions of [A.R.S. Section 12-821.01(A)]." *See id.* at 373 ¶ 17. We determined that those factors, along with PSPRS's creation by statute and regulation by state laws, supported the conclusion that PSPRS is a public entity, and is therefore subject to the notice of claim and limitations statutes. *Id.*

¶10 Here, as in *Pivotal Colorado II*, the Risk Pool finds its genesis within statutory authority because it was formed by its member-municipalities pursuant to A.R.S. Section 11-952.01. The legislature expressly granted authority to municipalities to form entities like the Risk Pool to aid in their compliance with the state's liability and workers' compensation insurance requirements. A.R.S. § 11-952.01(B). Because it exists under the auspices of that authority expressly granted to municipalities, the Risk Pool is a creature of statute.

4

**¶11**　　　　Further, like the governor's appointment of PSPRS's Board of Trustees, *Pivotal Colo. II*, 234 Ariz. at 371 ¶ 8, the Risk Pool is managed by a board of trustees, who are elected by the Risk Pool's members—which are themselves political subdivisions, A.R.S. § 11-952.01(H). The statute further requires that its board of trustees must be comprised "of at least three persons who are elected officials or employees of public entities within this state." *Id.* Moreover, the Risk Pool's board of trustees invests and manages its assets, which are derived exclusively from the member-municipalities' contributions of public monies, similar to functions of PSPRS's board. *Pivotal Colo. II*, 234 Ariz. at 371 ¶ 12.

**¶12**　　　　Also, the Risk Pool is subject to regulation by the state through a "bundle of statutes," like the state's regulation of PSPRS in *Pivotal Colorado II*. *Id.* at 373 ¶ 17. The Industrial Commission of Arizona ("ICA") is statutorily required to approve of the Risk Pool serving as a self-insurer and is authorized to regulate the Risk Pool's activities, adopt administration requirements, and perform audits and reviews of the Risk Pool. A.R.S. § 11-952.01(B).

**¶13**　　　　Wagner argues that the Risk Pool's regulation by the ICA is not indicative of its status as a public entity because private insurers are also subject to such regulation as well. Though true, the Risk Pool is subject to other state oversight that private insurers are not. For example, the Risk Pool is authorized to invest its members' funds in a manner only available to political subdivisions and other public entities, but subject to the authority and limitations set forth in A.R.S. Sections 11-952.01(Q) (limited by the constraints of A.R.S. Section 35-323) and -952.01(R) (limited by the constraints of A.R.S. Section 35-326).

**¶14**　　　　Further, like PSPRS, the Risk Pool uses public funds for a public purpose. *Pivotal Colo. II*, 234 Ariz. at 371 ¶ 8. As noted, the Risk Pool's assets are solely comprised of public funds, and excess funds are redistributed to the member-municipalities rather than kept as profit. It is also exempt from state and federal taxation. Referencing Section 501(c) of the Internal Revenue Code, Wagner argues that this too is not an indicator of public entity status, since private corporations—including other insurance providers—may also have tax exempt status under federal law. *See* 26 U.S.C. § 501(c). But Wagner's position is flawed. First, federal law also provides an exemption from tax liabilities exclusive to public entities. *See, e.g.,* 26 U.S.C. § 115(1). Therefore, Wagner is mistaken in his supposition that just because private entities may qualify for tax exemptions under one section of federal statutes, this means tax exemption can never be evidence of public entity status. Second, the Risk Pool's tax-exempt status is provided

for expressly by a statutory grant specific to it. A.R.S. § 11-952.01(G). Thus, Wagner's argument does not contradict the Risk Pool's status as a public entity.

**¶15**        In view of the above, and under the totality of the circumstances, we hold that the Risk Pool is a public entity for purposes of A.R.S. Section 12-821.01. Therefore, we reverse the court's entry of summary judgment to the contrary.

**¶16**        Because it is a public entity, Wagner was required to serve the Risk Pool with a compliant notice of claim no later than 180 days after accrual of his cause of action. A.R.S. § 12-821.01(A). Wagner concedes he did not do so. Therefore, Wagner's claims against the Risk Pool are barred because of this deficiency. We affirm the court's entry of judgment against Wagner on his claims against the Risk Pool and need not address his challenges to the court's grant of summary judgment in favor of the Risk Pool on other grounds. *See Vohland v. Maricopa Cnty.*, ___ Ariz. ___, ___, 571 P.3d 364, 366 ¶ 10 (App. 2025) ("We will affirm summary judgment if it is correct for any reason supported by the record.") (quoting *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329 ¶ 14 (App. 2014)).

## II.      The Superior Court Properly Dismissed Berkley from the Lawsuit.

**¶17**        Wagner further argues the superior court erred in dismissing Berkley from the lawsuit and asks that we hold Berkley has direct liability to him as a third-party administrator for bad faith claims arising out of its insurance claims handling, or, alternatively, that Berkley has vicarious liability on a joint-venture theory.

**¶18**        We review de novo the grant of summary judgment, viewing the "evidence and reasonable inferences in the light most favorable" to Wagner, against whom summary judgment was entered. *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003). When there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, we will affirm a grant of summary judgment. Ariz. R. Civ. P. 56(a); *Thompson v. Pima Cnty.*, 226 Ariz. 42, 44 ¶ 5 (App. 2010). And we will affirm summary judgment if it is correct for any reason supported by the record. *Vohland*, 571 P.3d at 366 ¶ 10.

### A.      Direct Liability

**¶19**        "Insurance bad faith denial-of-coverage claims arise when an insurer intentionally denies, fails to process, or fails to pay a claim without a reasonable basis for such action." *Satamian v. Great Divide Ins. Co.*, 257

Ariz. 163, 173 ¶ 28 (2024) (citing *Ness v. W. Sec. Life Ins.*, 174 Ariz. 497, 500 (App. 1992)). Such claims are derived from the covenant of good faith and fair dealing. *See Manterola v. Farmers Ins. Exch.*, 200 Ariz. 572, 576 ¶ 9 (App. 2001) ("[B]ad faith tort actions are based in the underlying contract.") (quoting *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 189 Ariz. 369, 377 n.4 (App. 1996)). The covenant of good faith and fair dealing is implied by law in every contract in Arizona, including insurance contracts generally, *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, 582 ¶ 8 (App. 2001), *as corrected* (May 24, 2001), and in the context of workers' compensation coverage more specifically, *id.* at 583 ¶ 11. The implied covenant imposes a duty on contracting not to impair the other's right to the benefits that flow from the agreement. *Id.* at 582 ¶ 8. And while occurrence of a breach of that contractual relationship is not required to sustain a bad faith claim, a contractual nexus is a necessary element to any bad faith claim. *Id.* at 582–83 ¶ 10.

¶20 Wagner argues that he can assert a bad faith claim against Berkley arising out of the duty it owed him based on a "special relationship" between them. Duties may arise from a special relationship between parties, including relationships based in contract. *Stanley v. McCarver*, 208 Ariz. 219, 221 ¶ 7 (2004). The determination of whether a special relationship is present depends on "whether a sufficient relationship exists between the parties to make it reasonable, as a matter of public policy, to impose a duty." *Id.* at 222 ¶ 10 (citation modified).

¶21 However, examination of special relationships normally arises in the context of assessing the existence of a duty for purposes of a negligence claim. *See id.*; *Gipson v. Kasey*, 214 Ariz. 141 (2007); *Diggs v. Arizona Cardiologists, Ltd.*, 198 Ariz. 198 (App. 2000). A bad faith claim is not a negligence claim. Rather, a bad faith claim is an intentional tort which arises out of contractual relationships. *Manterola*, 200 Ariz. at 576 ¶ 9 (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 160 (1986)). Wagner cites no authority recognizing the existence of any non-contractual special relationship in the bad faith context. On the contrary, all the cases cited by Wagner address special relationships that have been long-recognized in common law—doctor-patient, employee-employer, landlord-invitee, etc. The "third-party administrator-insured" relationship is not one that is historically acknowledged in the common law as giving rise to any non-contractual duties.

¶22 Here, Berkley serves as a third-party administrator for the Risk Pool and was tasked with administering Wagner's claim. The undisputed evidence shows that Berkley's contract to provide such services

7

is with the Risk Pool alone; Wagner does not argue that he is a party to it. Instead, Wagner argues that direct liability attaches to Berkley because it served as the Risk Pool's agent when it denied Wagner's claims, and, as the Risk Pool's agent, it was directly liable for its bad-faith torts. This argument posits that because the Risk Pool owed a duty of good faith and fair dealing towards Wagner, and because the Risk Pool would be liable for its agent's bad faith, so too must its agent necessarily have the same duty and liability directly to him. Not so.

¶23        The Risk Pool concedes that it owes a duty of good faith to Wagner as its insured, notwithstanding that it has tasked Berkley with performing its claims administration obligations to Wagner on its behalf. But such liability is clear because it flows from the contractual relationship between the Risk Pool as insurer and Wagner as insured. *See Walter v. F.J. Simmons*, 169 Ariz. 229, 238 (App. 1991) ("[A]n insurer who owes the legally imposed duty of good faith to its insureds cannot escape liability for a breach of that duty by delegating it to another, regardless of how the relationship of that third party is characterized."); *Meineke v. GAB Bus. Servs., Inc.*, 195 Ariz. 564, 568 ¶ 18 (App. 1999) ("If the [third party] adjuster mishandles the claim, the insurer has the same liability to the insured as if an employee of the insurer had mishandled the claim."). This record reveals no contractual nexus between Wagner and Berkley to support Wagner's bad faith claim directly against Berkley. *Rowland*, 199 Ariz. at 582–83 ¶ 10.

¶24        Wagner argues that our supreme court's decision in *Gatecliff v. Great Republic Life Insurance Co.*, 170 Ariz. 34 (1991), establishes direct liability for bad faith claims against "a person who intentionally and unreasonably causes an insured the denial of policy benefits . . . even if that person is not a party to the insurance contract." But *Gatecliff* is distinguishable from the facts of this case.

¶25        In *Gatecliff*, our supreme court held that a parent company could be directly liable for insurance bad faith for performing claims management functions for its subsidiary company that issued the insurance contract to the insureds, even though the parent company was not a party to that contract. *Id.* at 39–40. But this holding was premised on evidence that the parent company had near total control of its subsidiary that issued the contract. *Id.* at 40. By contrast, no evidence in this record indicates that the Risk Pool and Berkley have a parent-subsidiary relationship or that Berkley had any direct control over the Risk Pool. Though *Gatecliff*'s direct liability analysis stands independent of those findings, we find the difference meaningful because the facts of this case do not similarly implicate the *Gatecliff* court's concerns about fraud or injustice. *See id.* at 38 ("Upon review

of the record, we also find that the interrelationship between the two corporations may promote fraud or injustice[.]"). The *Gatecliff* analysis was grounded in addressing the facts of that case, in which a parent company acted through an agent to insulate itself from bad faith liability. *Id.* at 39–40. But as already noted, the Risk Pool admits that it is liable for any bad faith conduct undertaken by its agent Berkley. Thus, unlike in *Gatecliff*, the principal here is not attempting to improperly shield itself behind an agent. Liability for Wagner's claims of bad faith would properly lie against the Risk Pool, and that difference makes the analysis in *Gatecliff* inapposite to this case.

### B.    Joint Venture

¶26        Wagner alternatively argues that Berkley is liable to him as a participant in a joint venture with the Risk Pool.

¶27        "Vicarious liability for concerted action may be found to exist when the tort-feasors have entered into a . . . joint venture." *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 540 (1982). To determine whether parties are engaged in a joint venture, *Tanner Cos. v. Superior Court*, 144 Ariz. 141, 143 (1985) (citing *Ellingson v. Sloan*, 22 Ariz. App. 383 (1975)), sets forth the following elements: "(1) a contract; (2) a common purpose; (3) a community of interest; (4) an equal right to control; and (5) participation in the profits and losses." However, the fifth element requiring participation in profits and losses need not be shown in the context of so-called "social circumstances." *Est. of Hernandez v. Flavio*, 187 Ariz. 506, 509–10 (1997) (applying joint venture liability in the context of school fraternity activities).

¶28        Here, there is no evidence to establish profit and loss sharing by Berkely and the Risk Pool, and Wagner does not contend otherwise. Wagner argues, however, that this element is not required under *Sparks* and *Farr v. Transamerica Occidental Life Insurance Co. of California*, 145 Ariz. 1 (App. 1984). In *Sparks*, our supreme court concluded that the agent was engaged in a joint venture with the insurer, noting that the agent issued certificates of coverage, billed and collected premiums, investigated and paid claims, and distributed brochures to market the policies. 132 Ariz. at 539–40. But our supreme court did not expressly address the profit-and-loss sharing element. By contrast, this court in *Farr* recognized a joint venture where the agent not only marketed the insurer's policy, but also "received a commission on premiums collected as well as a percentage of renewal commissions[,]" a form of profit sharing. 145 Ariz. at 11. We find it significant that the court emphasized the necessity of the profit-and-loss element in both *Farr* and in *Estate of Hernandez*, with the latter clarifying that

the element does not apply in the context of social ventures. *Id.*; *Est. of Hernandez*, 187 Ariz. at 509. Because this case does not involve a social venture, the element applies.

¶29   Further, the facts of this case differ from those in *Farr* and *Sparks*. The agent's commission on premiums collected and renewals in *Farr* is at least evidence of sharing of profit and losses. *See* 145 Ariz. at 11. There is no such evidence in this record. Also, the "marketing" assigned to Berkley appears vastly different in character from the kind referenced in *Sparks* and *Farr*, as both advertised commercial insurance to the general public. *See Sparks*, 132 Ariz. at 539–40; *see also id.* at 3. But here, Berkley's "marketing" is limited to activities listed in the Administrative Services Agreement ("ASA"), such as "develop[ing] an annual marketing plan and budget . . . attend[ing] meetings of city/town councils or meetings of other public agency governing boards . . . [and] maintain[ing] and publish[ing] the [Risk] Pool's website." The activities undertaken on behalf of the Risk Pool are confined to municipalities and their constituent groups. Thus, the Risk Pool's "marketing" is not targeted to the public at large, a fact we find distinguishing.

¶30   Further, a joint venture requires an equal right of control, meaning that "each joint venturer must share, to some extent, in the control of the venture." *Est. of Hernandez*, 187 Ariz. at 510. To establish a joint venture in this case, Wagner must show that Berkley had some "right to be heard in the *control* and management of the venture." *Id.* (emphasis added). While Berkley has been delegated broad power to administer claims by the Risk Pool, the record does not indicate it had any right to control the venture between them. Moreover, "[w]here a joint venture exists, each of the parties is the agent of the others and each is likewise a principal so that the act of one is the act of all." *Sparks*, 132 Ariz. at 540. But in this case, the record establishes only that Berkley is an agent for the Risk Pool as principal, with no joint agency between the two.

¶31   Thus, the superior court correctly concluded that Berkley was neither directly liable to Wagner nor engaged in a joint venture giving rise to vicarious liability for bad faith, and therefore it does not owe its own separate and distinct duty of good faith and fair dealing to Wagner. We affirm the court's dismissal of Berkley from the lawsuit.

## III. The Superior Court Erred in Awarding Berkley Attorneys' Fees.

¶32   The superior court denied the Risk Pool's fee application in full, and awarded Berkley $93,000 of the $118,637.50 fee award that it

10

sought. Wagner challenges[1] the superior court's award of fees to Berkley. We review an award of attorneys' fees and costs for abuse of discretion and will affirm the award if reasonable. *Peterson v. City of Surprise*, 244 Ariz. 247, 253 ¶ 25 (App. 2018). "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees." A.R.S. § 12-341.01(A).

**¶33**        Berkley argued that Wagner's direct liability claim was not tenable and that Wagner's attorney should have known it was not tenable because counsel raised the same issue, and lost, in separate litigation filed on behalf of a different client in federal district court. *See McCalla v. ACE Am. Ins. Co.*, CV-20-01561-PHX-JAT, 2022 WL 2290552, at *12 (D. Ariz. June 24, 2022). According to Berkley, an award of fees against Wagner was warranted because his counsel "lost" on "this exact same issue" in unrelated litigation, and Berkley "should not have to bear the burden of legal fees so that plaintiffs can continuing [*sic.*] simply running this claim up the flagpole over and over again to see if they can luck out with a different result." Berkley raises the same argument on appeal, asserting in its answering brief that "Wagner's counsel had recently litigated the viability of a direct claim of insurance bad faith against the [third party administrator], and lost." Berkley maintains that the fee award should be affirmed because "[t]he unfavorable ruling" in the unrelated case "did not deter counsel from raising it again."

**¶34**        Berkley takes the position, in effect, that the fee award should be affirmed because Wagner not only asserted an unsuccessful claim in this case, but because his lawyer raised the same issue, unsuccessfully, on behalf of a different client in a different case in a different jurisdiction.

**¶35**        A ruling by a federal district court on an issue of Arizona law, though persuasive, is not binding on Arizona courts. *Arpaio v. Figueroa*, 229

---

[1]        Wagner argued to the superior court that Berkley's fees were unreasonable as requested. The billing records that Berkley submitted in support of its fee application are so heavily redacted that we cannot conduct an intelligent review for the purpose of assessing the reasonableness of the fees. *See Schweiger v. China Doll Rest., Inc.*, 138 Ariz. 183, 188 (App. 1983) ("In order for the court to make a determination that the hours claimed are justified, the fee application must be in sufficient detail to enable the court to assess the reasonableness of the time incurred.") However, Wagner did not raise this argument on appeal, so he has waived it, and we do not address it further.

Ariz. 444, 447 ¶ 11 (App. 2012). Wagner's counsel was not, therefore, precluded from asserting the claims here simply because a federal district court rejected them when he asserted them on behalf of a different client. In other words, an argument is not frivolous merely because it was previously rejected by a court in another jurisdiction. *Cf. Ariz. Republican Party v. Richer*, 257 Ariz. 237, 243 ¶ 15 (2024) (recognizing that "a claim may lack winning merit without being sufficiently devoid of rational support to render it groundless"). Any other rule would chill creative advocacy and impede the development of the law. *Id.* at 251 ¶ 49 (vacating fee award and warning that "courts risk chilling legal advocacy" by "sanctioning parties and their lawyers for bringing debatable, long-shot complaints").

**¶36** Berkley's argument that fees should be assessed against Wagner because his lawyer raised an argument previously rejected in another jurisdiction is improper and cannot form the basis of, or influence the amount of, a fee award. Yet the court's fee award cites only "unreasonableness" as grounds for the award and does not identify Wagner's purportedly unreasonable litigation conduct. Because the court did not clearly indicate whether its decision to award fees was, at least in part, based on Berkley's allegedly improper argument, the award of fees is vacated and remanded so the court can reconsider without any weight given to counsel's making an unsuccessful argument in a different jurisdiction in an entirely separate and distinct case.

**¶37** Appellees also request attorneys' fees incurred on appeal pursuant to A.R.S. Section 12-341.01(A). In exercise of our discretion, we deny the request for attorneys' fees but award Appellees their costs on appeal, contingent on their compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

**¶38** For the foregoing reasons, we reverse in part, vacate and remand in part, and affirm in part.

**F U R U Y A,** Judge, specially concurring:

**¶39**        Though the parties did not reference it, I further believe that the Risk Pool is a public entity because it is subject to regulation under Arizona's Open Meeting and Public Records laws. These form important and distinctive additions to the "bundle of statutes that . . . regulate an entity that make[] it a public entity for purposes of the notice of claim and corresponding limitations statutes." *Pivotal Colo. II*, 234 Ariz. at 373 ¶ 17.

### A.        Open Meeting Law

**¶40**        Under Arizona's Open Meeting Law, "[a]ll meetings of any *public body* shall be public meetings" and are subject to the open meeting law. A.R.S. § 38-431.01(A) (emphasis added). A "public body" is defined as including "all multimember governing bodies of departments, agencies, institutions and instrumentalities of this state or political subdivisions, including without limitation all corporations and *other instrumentalities whose boards of directors are appointed or elected by this state or a political subdivision*." A.R.S. § 38-431(6) (emphasis added).

**¶41**        I find persuasive Attorney General Opinion I07-001, which analyzed this statute in its determination that the Open Meeting Law applies to the Board of Trustees of the Northern Arizona Public Employees Benefit Trust ("NAPEBT"). The opinion relied on *Prescott Newspapers, Inc. v. Yavapai Community Hospital Association*, 163 Ariz. 33 (App. 1989), in which we stated that to determine whether an entity constitutes an instrumentality of a political subdivision, we look to "whether the function performed by the entity is committed to the political subdivision, i.e., is it something the political subdivision could do itself." Op. Ariz. Att'y Gen. I07-001, 2007 WL 419654, at *2. The opinion concluded that the Board of Trustees was a "public body" because it is an "instrumentality of the participating political subdivisions and each trustee of the Board is appointed by the political subdivisions." *Id.* at *3. Also, the NAPEBT and its Board "were created by the various political subdivisions to carry out the duties and powers of the government entities . . . ." *Id.*

**¶42**        Here, the Risk Pool is similar to NAPEBT and its Board because it is created by various political subdivisions—its member-municipalities—and it was created pursuant to state statute by an intergovernmental agreement between these various political subdivisions. A.R.S. § 23-961.01(A).

The Risk Pool is also tasked with carrying out a duty of the municipalities, which is to provide workers' compensation insurance, as required by the state. Further, it operates under the control of the municipalities to carry out this function, like NAPEBT carries out the function of providing health and welfare benefits to the government entities' employees.

**¶43**        Also, like NAPEBT and its Board, the Risk Pool's member-municipalities retain control over the Board and appoint and remove Board members in accordance with A.R.S. Section 11-952.01(H). Thus, the Risk Pool is an instrumentality of the state as a corporation formed by a political subdivision. Therefore, in my view, the Risk Pool is subject to the Open Meeting Law, a circumstance that I believe further evidences its character as a "public entity" for purposes of applying A.R.S. Section 12-821.01.

### B.        Public Records Law

**¶44**        Similarly, I would hold that Arizona's Public Records Law apply to the Risk Pool. Our supreme court has said that "access and disclosure is the strong policy of the law[.]" *Carlson v. Pima Cnty.*, 141 Ariz. 487, 491 (1984). As such, in the absence of a specific legislative exemption, the Public Records Law applies to every "public body." A.R.S. § 39-121.01(B). The Public Records Law define a "public body" as including "any public organization or agency, supported in whole or in part by monies from this state[.]" A.R.S. § 39-121.01(A)(2). Here, the Risk Pool is funded solely by public monies provided by its member-municipalities. Therefore, I believe it is subject to Arizona's Public Records Law.

**¶45**        Where Wagner argues that private corporations and the Risk Pool are subject to the same statutes requiring ICA and Department of Insurance regulation—concluding that such regulation is not evidence that the Risk Pool is a public entity—the Risk Pool's subjection to the Open Meeting and Public Records laws provides a compelling counterpoint. The Open Meeting and Public Records laws are statutes solely applicable to public bodies, and in my view, the Risk Pool is subject to these laws. Though the definition of "public entity" under A.R.S. Section 12-820(7) may differ from that of "public body" in A.R.S. Section 38-431(6)—Open Meeting Law—and A.R.S. Section 39-121.01(A)(2)—Public Records Law—I nevertheless view their subjects as inherently related and relevant.

These statutes represent additional regulations by the state, to which private insurers are clearly not subject. Thus, I find them additional compelling indicators that convince me that the Risk Pool is a "public entity" for purposes of the notice of claim statute.

